[No. G011571. Fourth Dist., Div. Three. Mar. 30, 1993.]

SEAN JENSEN, Plaintiff and Appellant, v.
HEWLETT-PACKARD COMPANY et al., Defendants and Respondents.

## COUNSEL

Stephen W. Berger for Plaintiff and Appellant.

Gibson, Dunn & Crutcher, Dennis A. Gladwell and Gunnar B. Gooding for Defendants and Respondents.

## OPINION

**SONENSHINE, J.**—Sean Jensen seeks reversal of a judgment of nonsuit following his opening statement at the trial of his defamation action against his former employer, Hewlett-Packard Company, and one of its supervisors, Rod Smith. In a nutshell, the lawsuit involves a difference of opinion between an employer and an employee about the quality of the employee's work. A Hewlett-Packard supervisor, Hank Phelps, evaluated the employee, Jensen, as needing to improve his on-the-job performance in certain

respects. Jensen took offense at the evaluation, claimed it was false, and accused Phelps of trying to hide his own incompetence. He demanded the evaluation be removed from his personnel file and challenged Phelps "to prove his various allegations to an impartial factfinder." Hewlett-Packard investigated the matter and sided with Phelps. Jensen filed the underlying lawsuit, but continued working at Hewlett-Packard.

As a prelude to our holding, we express our strong judicial disfavor for libel suits based on communications in employment performance reviews, particularly when, as here, the tort claim appears to be an attempted end run around *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373].[1] In light of the multitude of laws designed to protect the employee from oppressive employment practices,[2] evaluations serve the important business purpose of documenting the employer's hiring, promotion, discipline and firing practices. Moreover, the laudable practice of evaluating employees is to be encouraged for other important reasons. The performance review is a vehicle for informing the employee of what management expects, how the employee measures up, and what he or she needs to do to obtain wage increases, promotions or other recognition. Thus, the primary recipient and beneficiary of the communication is the employee. Tangential beneficiaries are ordinarily, as in the case here, all part of a management group with a common interest, i.e., the efficient running of the business.

---

[1] *Foley* holds: "[T]ort remedies are not available for breach of the implied covenant [of good faith and fair dealing] in an employment contract to employees who allege they have been discharged in violation of the covenant." (*Foley* v. *Interactive Data Corp.*, *supra*, 47 Cal.3d 654, 700, fn. omitted.)

Jensen's suit was filed before *Foley* was published—when a discharged employee could recover tort damages for the employer's breach of the implied covenant. (*Cleary* v. *American Airlines, Inc.* (1980) 111 Cal.App.3d 443 [168 Cal.Rptr. 722].) Indeed, as discussed, *infra*, Jensen's second amended complaint alleged a cause of action for breach of the implied covenant and sought tort damages.

[2] As noted in *Foley* v. *Interactive Data Corp.*, *supra*, 47 Cal.3d 654, 665, footnote 4: "Even where employment is at will, numerous federal and state statutes already impose express limitations on the right of an employer to discharge at will. Legislation, ranging from the National Labor Relations Act (29 U.S.C. § 158(a)(1), (3), (4) [precluding discharge for union activity, protected concerted activity, filing charges and testifying under the act]) to title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e-2, 2000e-3(a) [prohibiting discharge on the basis of race, color, religion, sex or national origin or for exercising rights under the act]), and state statutes precluding discharge for filing workers' compensation claims or in violation of state civil rights statutes, significantly circumscribe the at-will doctrine. [Citation.]"

The *Foley* court further stated: "In the employment relationship, the employer is already barred by law from, and the employee can obtain relief for, discriminatory discharges based on age, sex, race, and religion. Similarly, the employee is protected from discrimination based on the exercise of rights under the workers' compensation laws or for engaging in union activities. He [or she] can gain relief if . . . terminated in order for the employer to avoid payment of certain benefits. The employee may sue in tort for discharges based on breaches of public policy." (*Foley* v. *Interactive Data Corp.*, *supra*, 47 Cal.3d 654, 693, fn. 30.)

Clearly, there is a legitimate *raison d'être* for such records, and management has an unquestioned obligation to keep them. We would therefore be loathe to subject an employer to the threat of a libel suit in which a jury might decide, for instance, that the employee should have been given a rating of "average," rather than "needs improvement," or that the employee had an ability, unrecognized and unappreciated by a foolish supervisor, to get along with and lead others.

Yet that result is exactly what Jensen intended to accomplish with his libel action against Hewlett-Packard: to have an "impartial factfinder" judge whether Phelps was "right" or "wrong" in his criticisms of Jensen, which is to say whether Jensen was more valuable to Hewlett-Packard than the employer was willing to acknowledge.

■ Based on the facts here, we hold that unless an employer's performance evaluation falsely accuses an employee of criminal conduct, lack of integrity, dishonesty, incompetence or reprehensible personal characteristics or behavior (see *Polygram Records, Inc.* v. *Superior Court* (1985) 170 Cal.App.3d 543, 550 [216 Cal.Rptr. 252]), it cannot support a cause of action for libel. This is true even when the employer's perceptions about an employee's efforts, attitude, performance, potential or worth to the enterprise are objectively wrong and cannot be supported by reference to concrete, provable facts. Moreover, in light of *Foley*, where an employee alleges the employer's negative evaluations are *feigned*, the only potentially available remedy lies in contract, for breach of the implied covenant of good faith and fair dealing.

### Facts According to Jensen's Opening Statement

■ The court may grant a motion for nonsuit after opening statement "where it appears that counsel for plaintiff has stated all the facts that he [or she] expects to prove and that these would not make a prima facie case. [Citations.]" (7 Witkin, Cal. Procedure (3d ed. 1985) Trial, § 416, p. 417.) While nonsuits at this stage are, in general, disfavored (*ibid.*), "unnecessarily protracted litigation would have a chilling effect upon the exercise of First Amendment rights, [thus] speedy resolution of cases involving free speech is desirable." (*Good Government Group of Seal Beach, Inc.* v. *Superior Court* (1978) 22 Cal.3d 672, 685 [150 Cal.Rptr. 258, 586 P.2d 572].) We have no doubt that in defamation actions, nonsuit, like summary judgment, is "a favored remedy." (*Ibid.*)

■ To affirm a nonsuit, we assume the plaintiff will be able to prove the facts presented in the opening statement, but even so will be unable to

prevail. (*Loral Corp.* v. *Moyes* (1985) 174 Cal.App.3d 268, 272 [219 Cal.Rptr. 836].) Jensen's opening statement included the following facts which he intended to prove:

He was hired by Hewlett-Packard in July 1983 and received favorable performance evaluations in February and August 1984. When Hewlett-Packard offered him management of a newly created area project center, he declined the position. His coworker, Hank Phelps, accepted the job and became Jensen's boss.

Jensen received a merit salary increase in February 1985, but on May 10, Phelps gave him a written evaluation stating that while his work was adequate in certain respects, he had been the subject of some third party complaints, was not carrying his weight, had a negative attitude in dealing with others, evidenced a lack of direction in his project activities and was unwilling to take responsibility for the projects he oversaw.[3] Jensen objected to the evaluation in a letter to Phelps.[4] He then distributed the letter to other Hewlett-Packard managers, who told him, "Listen to your manager" and, "Clean up your act."

---

[3] Hewlett-Packard's Performance Evaluation and Development Plan is 14 pages long! It specifies the employer's criteria for measuring the employee's performance in various areas of responsibility. In each area, the employee is rated "exceptional," "very good," "good," "acceptable," or "unacceptable," and those terms are defined in the document.

The supervisor makes comments about the employee's accomplishments and shortcomings. For example: ". . . usually delegates all support activities rather than assuming a role as a deliverer of support services. His main job focus as 'project manager' has been questioned at times by customers, 3rd parties and peers. Lack of concern for information needed by HP mgmt has substantiated these observations."

The employer's expectations for improvement are also set out, e.g.: "Provide accurate, pro-active approach to project business by: [¶] (1) documenting all verbal correspondence (CPC) [¶] (2) exhibiting ownership for project problems (CPC) and [¶] (3) taking ownership during project changes and treating all project team members with professionalism."

At the end of the evaluation form, there is a page for employee remarks, with the advisement: "Each individual evaluated is encouraged to add any comments to this review. If additional space is needed, attach a separate sheet to this form." The employee is asked to sign an acknowledgement that he or she has met with the manager and discussed the evaluation.

During his supplemental opening statement, Jensen read to the jury all of the employer's evaluation comments, negative and positive.

[4] In his 12-page response dated June 7, 1985, Jensen took exception to every comment in the evaluation, asserting what he was being asked to do in the future he had already been doing in the past and the deficiencies cited were nonexistent. Here is a representative sample of Jensen's remarks: "You say that I have not been an effective communicator with corporate and third parties, and I dispute that; it is not true. You say that you have heard complaints about me, but you have never previously advised me of them or counseled me about them. [¶] You say that there have been complaints about my being inflexible and undependable, but that is directly contrary to my prior evaluations. . . . I have not done anything since August 31, 1984 to warrant your totally contrary evaluation. [¶] You say that my productivity is perceived as low, although it is as good or better than others in my group. You say that my

Jensen demanded Hewlett-Packard initiate an internal investigation of the evaluation, and he insisted the offending document be removed from his personnel file. Informally, he was told the evaluation would be retracted, but later he received a written memorandum advising him Hewlett-Packard had completed its investigation and concluded Phelps's concerns were well-founded and thus the evaluation would remain in his personnel file.

Jensen then brought the underlying suit, continuing to work at Hewlett-Packard. Phelps left the company, and Jensen was assigned to a new manager with whom he had no problems. He received assignments he deemed appropriate and, in February 1986, the manager gave him an evaluation Jensen thought was fair, even though it was critical in some respects.

But then, in a corporate reorganization, Jensen was assigned to a new manager who, rather than giving Jensen his requested assignments, ordered him to take on projects Jensen thought too difficult, and then faulted Jensen for poor productivity. In October 1986, Jensen's development plan required him to do the work of a software engineer. He felt he was ill-suited for the job, but his demands that Hewlett-Packard provide him with assistance fell on deaf ears. In May 1987, he received an assignment to report for a project in San Diego, to resolve a computer software problem. He failed to show up as directed and was fired for insubordination. Jensen chose not to seek to amend his complaint to allege wrongful termination or constructive discharge. Rather, he proceeded solely on his claim that the Phelps evaluation was libelous and in breach of the implied covenant of good faith and fair dealing,[5] the product of a conscious design intended to "engineer" the termination that eventually occurred two years later.

---

judgment is questionable, but again, your evaluation is totally contrary to my prior evaluations." Jensen's response extended even to a rating of "good" in one category as unacceptable.

In the "employee comments" sheet from Hewlett-Packard's evaluation form, he stated: "This evaluation is utter nonsense. It is prejudiced, and reflects Mr. Phelps' attempt to place the blame for his own failings and incompetence on me. [¶] I . . . challenge Mr. Phelps to prove his various allegations to an impartial factfinder. . . . I request that a copy of my letter be attached hereto as a permanent part of this evaluation, should this evaluation become a permanent part of my employment record. [¶] The foregoing, and my June 7, 1985 letter, are without prejudice."

[5]Jensen alleged: "By reason of the wrongful acts previously alleged here, e.g., by permitting Phelps and SMITH to falsify the May 85 Evaluation, and by reneging upon the initial agreement to withdraw the May 85 Evaluation from JENSEN's permanent employment record, and instead retaining the Evaluation there, although knowing it to be false in every material respect, HEWLETT PACKARD ratified or approved the wrongful acts complained of herein, and thereby engaged in bad faith action vis-à-vis JENSEN extraneous to the oral employment agreement with JENSEN, with the intent to frustrate JENSEN's employment of his contractual rights thereunder, including but not limited to JENSEN's right to receive and be judged at HEWLETT PACKARD on the basis of honest and truthful performance evaluations on a periodic basis, not a falsified evaluation intentionally calculated to make him a scapegoat for his

Jensen said the evaluation was published to Hewlett-Packard management personnel,[6] and Phelps could not have had an honest and good faith belief in the truth of the statements because they were without a factual basis. Phelps, anticipating a poor review himself, was simply trying to cover up his own incompetence. He implicated supervisor Rod Smith in the false evaluation process, telling Jensen, "I didn't do this alone."

Jensen maintained that as a result of the evaluation, he did not advance in his chosen position. His employee ranking declined and his job description ultimately changed. He was removed from project management, process control and factory automation—areas in which he had expertise, and was given sales support tasks. He received no merit increases after the Phelps evaluation, nor was he considered for promotions or "key assignments." No one asked for his help on "substantive tasks."

Jensen received an evaluation in February 1986, and two more in 1987.[7] His counsel claimed: "The May 1985 evaluation started an entire chain of events. It ruined [Jensen's] employee standing and his perception as a valuable Hewlett-Packard employee," and, ultimately, it led to Jensen's termination.

### The Motion for Nonsuit

■■■■■ Prior to Jensen's supplemental opening statement, Hewlett-Packard and Smith moved for nonsuit under Code of Civil Procedure section 581c, subdivision (a),[8] on the grounds of Jensen's failure to: (a) identify evaluation statements that could be deemed libelous; (b) state which statements were false and the facts showing why they were false; (c) identify evidence establishing malice; (d) state how and to whom the statements were

---

supervisors' poor performance and to engineer JENSEN's termination as a HEWLETT PACKARD employee."

[6]The individuals named by Jensen's counsel were all identified by Hewlett-Packard, without contradiction, as managers or management personnel with a business-related interest in the evaluation. Jensen's counsel speculated that persons "may have seen" the evaluation, but speculation does not prove publication as to such persons, and we disregard the statement.

[7]Copies of the 1987 evaluations were not given to Jensen at the time. In his opening statement, Jensen's counsel did not reveal the contents of those evaluations. Thus, we are in the dark about how his performance was perceived by management in 1987. With regard to the contents of the 1986 evaluation, the only reasonable inference is that it was favorable to Jensen since he took no exception to it and his counsel stated: "[E]ven the . . . February 3, 1986 evaluation, was not enough to *raise* his ranking [after the 1985 evaluation.]"

[8]All further statutory references are to the Code of Civil Procedure unless otherwise specified.

published; (e) identify any special damages; (f) establish a causal relationship between the alleged defamation and the injury suffered;[9] and (g) link Rod Smith to any of the statements.[10]

When Jensen completed his supplemental statement, Hewlett-Packard and Smith reiterated all of the above grounds as justifying a judgment of nonsuit. The court found Jensen had failed to present evidence of malice, publication "in the literal sense of the law of libel," or causation of the claimed injuries or damages. It therefore granted the motion for nonsuit.

*Discussion*

I

The first ground raised by Hewlett-Packard was Jensen's failure to present facts demonstrating the evaluation statement was libelous.[11] ■ In defamation actions, it is entirely appropriate for the court to determine in the first instance "whether the publication could reasonably have been understood to have a libelous meaning." (*Kapellas* v. *Kofman* (1969) 1 Cal.3d 20, 34, fn. 14 [81 Cal.Rptr. 360, 459 P.2d 912].)

"Libel is a false and unprivileged publication by writing . . . which exposes any person to hatred, contempt, ridicule, or obloquy, or which

---

[9]Citing *John Norton Farms, Inc.* v. *Todagco* (1981) 124 Cal.App.3d 149, 161 [177 Cal.Rptr. 215], Jensen contends we may not consider the causation ground because it was raised sua sponte by the court. Indeed, Hewlett-Packard's initial motion for nonsuit following the opening statement did not address the defect; the court alluded to lack of causation in colloquy with counsel following the opening statement. But Jensen's counsel was given the chance to make a supplemental statement, and before he did so, he queried the court: "The only thing is, I need to know what I need to address in order to cure the defects. I'm still at a loss as to what it is that I need to address." Counsel for Hewlett-Packard then, *before* Jensen's counsel began his supplemental opening statement, stated all grounds for its renewed motion for nonsuit, including the causation ground. Thus, Jensen obviously had ample notice that he needed to state the facts bearing on *all* issues he would need to prove, including causation, and his reliance on the *John Norton Farms* case is inapt.

[10]This constitutes a legitimate basis for the judgment of nonsuit in favor of Smith. Phelps's oblique remark about not having "done this alone" does not give rise to a permissible inference that Smith participated in preparation, planning or dissemination of the evaluation and Jensen presented no other facts linking Smith to publication of any defamatory statements.

[11]In his renewed motion for nonsuit, Hewlett-Packard's counsel said: "I do not believe that the plaintiff has identified any statement as a libelous statement, that is to say he has not identified a statement in the evaluation which he believed is libelous which would allow this court to test that at this stage whether or not that statement is in fact libelous or whether or not the jury is to ever find that it was libelous. [¶] Second, he has not identified a statement that he contends was false, that is to say he has not advanced a factual statement which this court or a jury could find was a factual statement and could conclude that in fact it was a false statement."

causes him [or her] to be shunned or avoided, or which has a tendency to injure him [or her] in his [or her] occupation." (Civ. Code, § 45.) ■ A publication "must contain a false statement of *fact*" to give rise to liability for defamation. (*Gregory* v. *McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 600 [131 Cal.Rptr. 641, 552 P.2d 425].) A statement of opinion "cannot be false and is outside the meaning of libel." (*Tschirky* v. *Superior Court* (1981) 124 Cal.App.3d 534, 539 [177 Cal.Rptr. 357].) "[T]he dispositive question . . . is 'whether a reasonable fact finder could conclude that the published statements imply a provably false factual assertion.' " (*Kahn* v. *Bower* (1991) 232 Cal.App.3d 1599, 1607 [284 Cal.Rptr. 244], fn. omitted.) The court examines the communication in light of the *context* in which it was published. The communication's meaning must be considered in reference to relevant factors, such as the occasion of the utterance, the persons addressed, the purpose to be served, and "all of the circumstances attending the publication." (*Polygram Records, Inc.* v. *Superior Court, supra,* 170 Cal.App.3d 543, 555.)

■ Under the above standards, could any of the comments in Phelps's evaluation reasonably be interpreted as false statements of fact? No. First, we note the context: The communication was a 14-page evaluation of Jensen's performance, prepared by Phelps in the course of his designated duties as Jensen's manager. It was one of a series of evaluations, less favorable than those that preceded *or* followed it. It documented one manager's assessment of Jensen's work habits, interpersonal skills and level of effort, and it outlined the employer's expectations with regard to Jensen's improvement. It was presented to Jensen for his review and its contents were seen by or made known to a number of management people who participated in periodic employee-ranking sessions. Jensen was given the opportunity to respond to the evaluation, which he did. There is absolutely nothing in the attendant circumstances tending to show the document constituted anything but business-as-usual.

Next, the word "evaluation" denotes opinion, not fact. ■ "Evaluation" is defined in Webster's Third New International Dictionary (1981) page 786, as ". . . the act or result of evaluating: JUDGMENT APPRAISAL, RATING, INTERPRETATION." To "evaluate" is: ". . . to examine and judge concerning the worth, quality, significance, amount, degree, or condition of." (*Ibid.*) ■ The dictionary definition is not necessarily dispositive of the fact/opinion issue, but it certainly implies the defendants' intended legitimate purpose of the document, i.e., its use as a management tool for examining, appraising, judging and documenting the employee's performance.

Finally, we turn to the contents of the evaluation, none of which suggests Jensen lacked honesty, integrity or the inherent competence, qualification,

capability or fitness to do his job, or that he had reprehensible personal characteristics. Three categories of comments are involved: ratings by which Phelps expressed a value judgment, such as "good," "acceptable" or "unacceptable," about Jensen's comparative level of skills, performance or attitude;[12] directions in which Phelps advised Jensen that he was expected to develop or improve in various areas;[13] and general remarks about Jensen's attitude toward his job responsibilities and his coworkers.[14]

But even if the comments were objectively unjustified or made in bad faith, they could not provide a legitimate basis for Jensen's libel claim because they were statements of opinion, not false statements of fact. ▮ Although the trial court did not grant the nonsuit based on that distinction, it clearly would have been authorized to do so: "The critical determination of whether the allegedly defamatory statement constitutes fact or opinion is a question of law. [Citations.]" (*Gregory* v. *McDonnell Douglas Corp.*, *supra*, 17 Cal.3d at p. 601.) ▮▮▮▮ And the court's reliance on other grounds in granting the nonsuit is of no consequence; we may affirm on any ground advanced by defendant in the trial court if the plaintiff has been given notice of the defect and an opportunity to cure it. (See *Loral Corp.* v. *Moyes*, *supra*, 174 Cal.App.3d 268, 272-273.)[15]

[12]The rating words are defined in the form: "EXCEPTIONAL: Performance consistently far exceeds expectations. [¶] VERY GOOD: Performance consistently exceeds normal expectations and job requirements. [¶] GOOD: Performance consistently meets expectations and job requirements. [¶] ACCEPTABLE: Performance usually meets expectations and minimum requirements for the job. [¶] UNACCEPTABLE: Performance is below the minimum acceptable level."

[13]For instance, Phelps advised Jensen: to work on reestablishing "healthy, constructive" relationships with third parties, peers and Hewlett-Packard managers; to learn the technical aspects of a project, including its support installations, sales and teaching components; to work on becoming a "competent resource person"; to refrain from making negative comments about third parties and staff people; to learn to become confident with an assigned project; and to complete steps to help establish himself as a productive company team player. Phelps warned Jensen that if he did not see efforts to remedy the problems, Jensen might be placed on probation or even terminated.

[14]Phelps said Jensen had not "increased his skill" in project definition and control; was not "pulling his weight" in meeting various sales objectives; appeared to lack concern for management's need for information; had "weak" knowledge of project management and process control; showed "lack of direction, inflexibility and lack of dependability" causing "unnecessary" delays in projects and "finger-pointing"; had a productivity "perceived as low" due to his "lack of personal ownership of tasks"; displayed "questionable judgment" in pursing personal "vindication" concerning "behavioral problems" and in breaching confidentiality of personnel matters between him and Phelps; did not "extend" himself by giving "a helping hand or pitching in"; projected an "attitude of if it's not my job, it's your problem"; displayed a "lack of attention" to tasks and "overall communication with the team"; and was the subject of a "tremendous amount of negative feedback."

[15]Had Jensen proved libelous statements, we would still affirm the nonsuit judgment because he presented no evidence of causation. Neither in his opening statement nor in his supplemental did he do more than recite the ways in which his work life changed between

## II

 ██ Our affirmance of the nonsuit judgment accords with *Foley* v. *Interactive Data Corp., supra*, 47 Cal.3d 654. Jensen's suit looks like an action for breach of the implied covenant of good faith and fair dealing.[16] Indeed, he began by alleging such a theory of recovery, but he chose to drop it, perhaps in light of *Foley*'s damage limitation. In any event, Jensen claims there was no basis in fact for Phelps's criticisms: He says Phelps only *pretended* to have a bad opinion about his worth as an employee because Phelps anticipated receiving a poor evaluation himself and was looking for a scapegoat. In other words, Phelps prepared the evaluation knowing there was no reasonable basis for his negative comments and for the sole purpose of avoiding responsibility for his own failings. This is a classic statement of breach of the implied covenant of good faith and fair dealing.

Analogous claims were made by the plaintiff in *Burton* v. *Security Pacific Nat. Bank* (1988) 197 Cal.App.3d 972 [243 Cal.Rptr. 277], where the appellate court affirmed a summary judgment in favor of the defendant employer. The employee had been fired for reading confidential materials kept in a restricted area. He denied the accusation, claiming he had been reading nonconfidential material in an open area. The employee alleged the reason given by the employer for his termination was untrue and used as a pretext; the employer actually wanted to get rid of him before he filed a grievance for the employer's prior violation of internal policy. But the employee had no material facts to support the pretext theory, and undisputed facts showed the employer had investigated the charge before terminating him.

---

1985 and 1987. He did not say he would show he was eligible for the salary increases he claims he should have received, or that the work he wanted was generally available, or that any witness would testify he should not have been reassigned to sales support, or that he would prove he would have progressed differently at Hewlett-Packard had the negative evaluation been retracted. Moreover, Jensen admitted Phelps's immediate successor gave him the work he wanted and wrote an acceptable evaluation in February 1986, and the two 1987 evaluations which Jensen's counsel failed to reveal also may have been acceptable. There can be no legitimate inference the Phelps evaluation poisoned the well and changed the course of Jensen's career with Hewlett-Packard.

As aptly noted in *Biggins* v. *Hanson* (1967) 252 Cal.App.2d 16, 24 [59 Cal.Rptr. 897], where plaintiff's former supervisor allegedly uttered defamatory statements in connection with plaintiff's termination: "The fact that plaintiff's income decreased after the libel is quite irrelevant unless he can show some causal connection."

[16] " '[T]he implied-in-law covenant of good faith and fair dealing protects the right of the parties to an agreement to receive the benefits of the agreement that they have entered into. The denial of a party's rights to those benefits, whatever they are, will breach the duty of good faith implicit in the contract. Thus, *the relevant inquiry always will focus on the contract itself, to determine what the parties did agree to.*' [Citation.]" (*Foley* v. *Interactive Data Corp., supra*, 47 Cal.3d 654, 699, fn. 41.)

We cite at length the *Burton* court's apt discussion. "The thrust of appellant's argument is that the claim that he was in a confidential area, reading confidential materials, was untrue and used as a pretext to legitimate his termination. [Citation.] He asserts that this factual dispute raised a material factual issue. [¶] Appellant has not brought forth one fact to support his theory that respondent contrived a reason for his discharge. [Citation.] Appellant's assertion is based solely on conjecture and speculation. His only factual claim is that he told his supervisor and another employee named Delores that he was going to file a grievance . . . . He offers no factual evidence, circumstantial or otherwise, that respondent or any supervisor fired appellant for this reason. Summary judgment was proper since there was no factual foundation for appellant's claim that the stated reason for discharge, being in the confidential area reading confidential materials, was a mere pretext for some other, impermissible reasons. [Citation.] [¶] Appellant's claim that he was not in fact in the confidential area reading confidential materials raises no issue of bad faith on the part of respondent. An implied covenant of good faith and fair dealing requires only that the employer act fairly and in good faith. [Citation.] To be entitled to a trial for breach of the implied covenant of good faith and fair dealing, appellant must bring forth facts to show that respondent acted in 'bad faith' and without 'probable cause.' [Citations.] Undisputed facts show that respondent investigated the charge that appellant was in the confidential area reading confidential materials. Appellant discussed the incident with at least two of respondent's employees, including the vice president of corporate employee relations. The assistant vice president personnel officer examined the area and documents in question; and there were at least three conversations among management personnel to discuss the allegations. Appellant presented no contrary evidence that respondent lacked probable cause to believe that appellant was in a confidential area reading confidential materals [*sic*] or that respondent lacked a good faith belief the charge was true. [¶] Appellant denied the charge, and respondent chose to believe other witnesses and to reject appellant's version. This raises no inference of bad faith on respondent's part." (*Burton* v. *Security Pacific Nat. Bank, supra,* 197 Cal.App.3d 972, 978-979.)

The *Burton* court noted it is "very common" for an employee to deny the existence of a basis for an employer's criticism. (197 Cal.App.3d at p. 979.) ▮ But where it is undisputed the employer has conducted an investigation and determined the issue against the employee, "there is no breach of the implied covenant of good faith and fair dealing, *even if the employee could subsequently prove that the factual finding of misconduct was a mistake.* [¶] If the law were otherwise, no employment contract could be 'at will' . . . . If the employee were entitled to jury trial for breach of the implied

covenant of good faith and fair dealing merely by asserting that the charged misconduct was not true, the decision to terminate would be at the discretion of a jury, not the employer. The law of employment contracts would be turned on its head." (*Burton* v. *Security Pacific Nat. Bank*, *supra*, 197 Cal.App.3d 972, 979, italics added.)[17]

*Burton*, a pre-*Foley* decision that survives *Foley*, cannot be distinguished meaningfully from the instant case. Jensen believed Phelps's evaluation of him to be false and in bad faith. He complained to other supervisors, who basically told him he should try to meet his supervisor's expectations. He complained to his employer, and his employer conducted an investigation and decided his complaint was not well taken. Jensen was not entitled to a jury's reevaluation of the matter.[18] His opening statement made clear he could present no more than pure conjecture and speculation on the issue of pretext/bad faith. He was not entitled to proceed under a theory of breach of the implied covenant of good faith and fair dealing.

The *Foley* court cautions it is poor policy to create an atmosphere of fear of liability which stifles management from exercising its " 'fundamental prerogatives . . . : to control the workplace and to retain only the best-qualified employees'." (*Foley* v. *Interactive Data Corp.*, *supra*, 47 Cal.3d 654, 696, fn. 33.) Here, there is no claim that the negative evaluation was fabricated as a pretext for prohibited discrimination; rather there is only Jensen's unsubstantiated charge his supervisor's opinion was objectively wrong and subjectively feigned. Under *Foley*'s admonitions regarding managerial discretion, we are compelled to conclude the court is an inappropriate

---

[17]The law of employment contracts would likewise be turned on its head if management had to justify to the employee's satisfaction each evaluative comment deemed unfair by the employee. Yet, this is precisely the burden Jensen sought to impose on the employer, as repeatedly demonstrated in his opening statement. For instance: "Following the evaluation, after it was issued and when . . . Mr. Jensen had raised his objections to it, Mr. Phelps and Mr. Jensen had a conversation. Mr. Phelps approached Mr. Jensen, he said he wanted to negotiate things, he said he was willing to take out some of the comments but he wanted to leave some in. He wanted Mr. Jensen to meet him halfway. He said that's a win/win situation, that they would both win. Mr. Jensen said no, the evaluation is *false, this is not a negotiation. You have to substantiate it, show me what they are.* If don't [*sic*], you've got to retract them." (Italics added.)

The test of good faith and fair dealing cannot be whether management is willing or able to identify, on demand, specific instances justifying a negative evaluation. Indeed, the conduct of management is presumed fair and reasonable until a disgruntled employee proves otherwise. Under *Burton*, the employee's claim that the employer lied is not sufficient to shift the burden. (*Burton* v. *Security Pacific Nat. Bank*, *supra*, 197 Cal.App.3d 972, 979.)

[18]As noted in *Foley*, " 'Juries in these cases often impose liability and large damage awards according to their own standards of fairness rather than the legal instructions provided by the judge. . . . [¶] Jurors can easily identify with the worker who has received a pink slip.' [Citations.]" (*Foley* v. *Interactive Data Corp.*, *supra*, 47 Cal.3d 654, 697, fn. 36.) The comment is equally appropriate in the context of employee performance evaluations.

forum for resolution of this grievance. No matter the denomination of the cause of action, employers should neither be required to justify performance evaluations by reference to objectively provable facts, nor subjected to fear of liability for good faith, but mistaken, judgments about the value of an individual employee to the business enterprise.

Judgment affirmed. Jensen shall bear the costs of appeal.

Sills, P. J., and Wallin, J., concurred.