Filed 4/29/14  Schimsky v. Higgins CA

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| ARNOLD SCHIMSKY, | D063860 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2011-00100978-CU-DF-CTL) |
| YOLANDA H. HIGGINS, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Joan M. Lewis, Judge.  Affirmed.

Yale & Baumgarten and David W. Baumgarten for Plaintiff and Appellant.

Law Offices of Joseph J. Barr, Jr., and Gary L. Ritchie for Defendant and Respondent.

This case arises out of comments made by defendant Yolanda H. Higgins, a 44-year-old student at the University of San Diego (USD), concerning her mathematics professor, plaintiff Arnold Schimsky.  She made those comments in response to advice from the mathematics chair, Dr. John Glick, that she submit a formal complaint and a

request to drop Schimsky's class, setting forth her reasons therefor, so she could drop the class past the drop deadline. Specifically, the comments made by Higgins were (1) Schimsky told that class that "algebra is harder for older people to get than if you are fresh out of school"; (2) when she went to see him during office hours, Schimsky spent the majority of the time discussing "psychic babble"; and (3) Schimsky announced to the class that he was disappointed with the class's test grades and "some people have full time jobs and [are] under a lot of stress and can't seem to do well because they have too much going on."

Schimsky asserts that as result of Higgins's comments, his reputation and career were "destroyed." He brought an action for defamation against Higgins. Schimsky asserted that Higgins falsely told the mathematics chair that he discriminated against her on the basis of her age and gender.

Higgins brought a motion for summary judgment, asserting that the statements were not defamatory, were expressions of opinion, and were privileged. The court granted the motion, finding (1) the statements were not defamatory and (2) were statements of opinion. Based on this ruling the court did not reach the issue of whether the statements were privileged.

On appeal, Schimsky asserts (1) the court erred in finding that Higgins's statements were not defamatory as a matter of law, (2) the court erred in finding the statements were nonactionable opinion, and (3) the statements were not privileged. We affirm.

2

FACTUAL AND PROCEDURAL BACKGROUND

A.  *Schimsky's Time at USD*

Schimsky taught at USD for 23 years as an adjunct math professor.  In the 1980's and 1990's he had no complaints against him and had positive peer reviews.

However, in 2003 Schimsky had a complaint over his harsh treatment of a student. In 2005 he began having negative peer evaluations, describing his teaching style as having "not a lot of energy in the classroom," running out of prepared materials, and simply reading from the textbook.  By 2005, seven of his 15 students described Schimsky as unprepared and a below-average-to-poor instructor.

In 2006 or 2007 Schimsky's supervisor learned of a complaint that he was engaging in inappropriate conversations with students on subjects unrelated to his math instruction including discussion of "numerology," which is a belief that certain birth dates are unlucky due to the numbers involved, and he was warned not to go off on "tangents" with students.

In 2007 he had another complaint from a student about his interactions with her. Specifically, the student complained that he told her she would pass the class, but then failed her.  Also in 2007 Schimsky complained he was not receiving any teaching assignments for the fall.

Schimsky's student evaluations became increasingly negative, with comments such as:  "He was incredibly discouraging and not so nice"; "his way of explaining things completely confused me"; "[i]nstructor was incredibly unorganized"; "he didn't welcome questions"; "I would never recommend this professor"; and "I hated this class!  During

3

the class he went over problems in the book that were already solved for us. Didn't really teach us how to get the answer."

In November 2007 Schimsky complained to the then-dean of the College of Arts and Sciences, Dr. Nicholas Healy, about not getting classes for the spring of 2008. Thereafter, Schimsky sent a series of e-mails in which he accused USD of obstructing his obtaining teaching assignments. Dr. Glick responded that part-time instructors were not guaranteed teaching assignments. Dr. Healy informed him that Dr. Glick's response was appropriate and that Schimsky likely would not be offered a course.

At that time, Schimsky was evaluated by a full-time professor, who commented, "[Schimsky] was pretty much just reading the textbook to the students. . . . [¶] . . . [¶] On the whole, I found the class to be excruciatingly boring."

Schimsky filed a complaint against his supervisor, Dr. Glick, with the USD provost office accusing Dr. Glick of poor communication and misconduct and requested he receive a class for the spring of 2008. Ultimately, Schimsky received a class.

In April 2008 Schimsky sent a series of e-mails again complaining about his supervisor's communication skills and that his peer evaluations were improper and requesting a class for the fall of 2008.

Schimsky was given two classes for the fall of 2008. Although some of his student evaluations were positive, there were several negative comments, including (1) "[h]e is a disrespectful rude professor that [*sic*] needs to get a job not working with people. He called me stupid and degraded me. He should never be allowed to teach at a school again"; (2) "[t]he instructor did not explain the materials in a clear way. He talked

4

about subjects in math that did not even pertain to the syllabus"; (3) "[he] singled me out in class and on my homework"; and (4) "I highly recommend dismissing [him] from the staff at USD."

In Spring 2009 Schimsky was given one class. At that time, he underwent a peer evaluation by Jeffrey Wright, Ph.D., who wrote: (1) "It is with disappointment that I must write you about my impressions upon visiting [Schimsky's] college algebra class . . . . While his mastery of the course material is deep, I found his classroom methods to be poor both in style and in content"; (2) "[Schimsky's] class was so tightly run as to be stifling"; and (3) "I am very sorry to have to give such a negative report . . . the combination of [Schimsky's] poor classroom 'energy' and his choice of rote, mindless topics to teach, leads me to conclude that our students would be better served by someone whose teaching philosophy more closely reflected our own."

When shown the peer evaluation, Schimsky challenged Dr. Wright's peer evaluation as being improper. He also attacked his supervisor, Dr. Glick.

Schimsky was given one class for Fall 2009. Again, there were significant negative student evaluations including: (1) "he had teaching methods difficult to understand and he drifted off during class frequently from math"; (2) "the professor's techniques of teaching were terrible"; (3) "horrible"; (4) "incredibly harsh in class"; (5) "teaching methods hard to follow"; (6) "just re-writing book examples on the board"; (7) "fails to explain the course very well"; (8) "[h]is methods of explaining were confusing"; and (9) "hard to follow during class."

5

Thirty-four percent of his students dropped his course, compared to the USD average of 3 percent.

In the fall of 2009 he had a dispute with a student and a health services center employee. The student reported that Schimsky refused to accept health services excused absence reports. It was reported that Schimsky yelled at a health service receptionist, saying, "[A]ren't you professionals? What is so hard for you to write a note? [I]f a student can walk in on her own two feet to the Student Health Center, then why can't she walk to [the] classroom and take a quiz?"

In the fall of 2010 Schimsky was given two classes.

B. *Higgins's Interactions with Schimsky*

In the fall of 2010 Higgins, who was a 44-year old student, enrolled in Schimsky's math class.

According to Higgins, Schimsky knew that she was an older student who worked full time and that she had suffered spousal abuse in the past. On three occasions Higgins came to Schimsky's office because she was struggling with his math class.

Higgins contends that the first time she came into his office Schimsky came to the conclusion she did not belong in his class. At that first office visit, Schimsky engaged her in a conversation about their personal lives and asked about her health and her past abusive relationship. She was uncomfortable with this conversation, but was afraid to say anything for fear of sounding rude, jeopardizing her grades and impacting his attitude towards her.

6

According to Higgins, at the second office visit, Schimsky spent about 20 minutes discussing math and then engaged in an almost three-hour discussion of non-math-related subjects, including his theory of "numerology," which she felt was "psychic babble." During that conversation Schimsky told her he was not supposed to engage in such conversations, as he had previously been reprimanded by school administration for doing so. Schimsky denies making such a statement or that he had previously been reprimanded by USD administration for discussing non-math-related topics.

At her final office visit with Schimsky, he began reading from the school syllabus concerning USD's policy on how much of a refund she would receive if she dropped the class. Higgins became very upset, stated she was not going to drop the class, and ran out of the office in tears.

Higgins felt that Schimsky was singling her out. He made a comment that older students who had been away from high school math for a long time tended to struggle with the work in his class. Higgins was the only older student and felt embarrassed.

Higgins continued to struggle in Schimsky's class, but felt uncomfortable going to Schimsky again so she went to see Dr. Glick. She did not want to drop the class, but only wanted to get help with the class.

Dr. Glick gave Higgins the option of staying in the class and getting tutoring help or dropping the class. Higgins indicated she wanted to stay in the class, and Dr. Glick arranged math tutoring for her. However, at her next class session Schimsky, while looking at her, stated that the class had done poorly on the last quiz and stated some students were working full-time jobs and not devoting enough time to his class. Higgins

7

went to work after class and thus came to class dressed in business attire. Because of this she perceived that he was talking about her and was embarrassed. At that point, Higgins decided she would not continue in Schimsky's class.

Higgins contacted Dr. Glick again to discuss her desire to drop the class. Dr. Glick requested that she submit a formal complaint and request to drop the class, setting forth her reasons for not wishing to continue.

On October 27, 2010, Higgins sent an e-mail making a formal complaint and a request to drop the class. Dr. Glick confirmed this communication was being treated as a formal complaint and conveyed it to his supervisor. The formal complaint cited three examples of Schimsky's actions that made her feel unable to continue with the class: (1) Schimsky announced to the class that "algebra is harder for older people to get than if you are fresh out of high school"; (2) during an office visit with Schimsky, he spent nearly three hours discussing non-course-related issues that Higgins thought was "pyschic babble"; and (3) Schimsky told the class that "some people have full time jobs and [are] under a lot of stress and can't seem to do well because they have too much going on."

According to Higgins, she had no hatred or ill will towards Schimsky; she just was too uncomfortable and discouraged to continue in his class. Schimsky admits he has no information that Higgins bore him any malice or ill will or that she even disliked him.

C. *USD's Investigation and Hearing*

The USD administration, through Dr. Glick, and Noelle Norton, the assistant dean of the College of Arts and Sciences, conducted an investigation into Higgins's

8

complaints.  An investigation hearing was granted to Schimsky where he was permitted to view the complaint and evidence against him and to respond.  He denied Higgins's allegations.

The USD administration determined that they did not believe Schimsky as, unbeknownst to Higgins, he had engaged in similar conduct in the past with others, as described, *ante*.  The USD administration also determined that Schimsky had, unbeknownst to Higgins, gone to the school administration and investigated her.

Higgins's request to drop the class was granted.

D.  *Schimsky Is Not Rehired*

A year later, in around July 2011, a decision was made not to rehire Schimsky for the fall of 2011.  This decision was based upon a combination of years of poor peer evaluations, poor student evaluations, complaints from students and staff, the existence of better applicants, and the small number of math classes available to part-time teachers.

E.  *The Instant Lawsuit*

In November 2011 Schimsky filed this action against Higgins, stating causes of action for defamation per se and defamation.  The complaint alleged that Higgins falsely told USD that he had discriminated against her on the basis of age and gender.

Thereafter, Higgins brought a motion for summary judgment asserting (1) her statements were not defamatory and were an expression of opinion; (2) the absolute privilege in Civil Code[1] section 47, subdivision (b) (section 47(b)) barred Schimsky's

---

1       All further undesignated statutory references are to the Civil Code.

9

claim; and (3) the qualified privilege in section 47, subdivision (c) (section 47(c)) barred Schimsky's claims.

The court granted the motion, stating, "As an initial matter, the Court does not believe the statements are defamatory.  However, even if the statements could be considered defamatory, they are merely statements of opinion.  [¶] As a result, the motion for summary judgment is granted.  [¶] In granting summary judgment the Court did not need to reach [Schimsky's] alternative arguments of privilege based upon [section 47(b) or (c)] or [Schimsky's] request for a continuance to conduct discovery directed to the [section] 47(c) issue."

In doing so, based upon lack of foundation, the court sustained Higgins's objection to Schimsky's declaration wherein he claimed he was not rehired because of Higgins's complaint and drop request.

DISCUSSION

I. *STANDARDS GOVERNING SUMMARY JUDGMENT MOTIONS*

"Because this case comes before us after the trial court's grant of summary judgment, we apply these well-established rules:  ' " '[W]e take the facts from the record that was before the trial court when it ruled on that motion,' " ' and we ' " ' " 'review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.' " ' " ' [Citation.]  We also ' " 'liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party.' " ' " (*Tverberg v. Fillner Construction*, *Inc.* (2010) 49 Cal.4th 518, 522.)  "We

10

need not defer to the trial court and are not bound by the reasons in its summary judgment ruling; we review the ruling of the trial court, not its rationale." (*Oakland Raiders v. National Football League* (2005) 131 Cal.App.4th 621, 630.)

## II. *ANALYSIS*

### A. *The Statements Were Not Defamatory*

Defamation can be of two types: libel or slander. (§ 44.) Libel is defined in section 45[2] and slander in section 46.[3] The elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage. (*Taus v. Loftus* (2007) 40 Cal.4th 683, 720; see also *Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 470.)

"'Defamation constitutes an injury to reputation; the injury may occur by means of libel or slander. [Citation.] . . . A false and unprivileged oral communication attributing

---

[2]     Section 45 provides: "Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation."

[3]     Section 46 provides: "Slander is a false and unprivileged publication, orally uttered . . . which: [¶] 1. Charges any person with crime, or with having been indicted, convicted, or punished for crime; [¶] 2. Imputes in him the present existence of an infectious, contagious, or loathsome disease; [¶] 3. Tends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits; [¶] 4. Imputes to him impotence or a want of chastity; or [¶] 5. Which, by natural consequence, causes actual damage."

11

to a person specific misdeeds or certain unfavorable characteristics or qualities, or uttering certain other derogatory statements regarding a person, constitutes slander.' " (*Haley v. Casa Del Rey Homeowners Assn.* (2007) 153 Cal.App.4th 863, 877, italics omitted.)

In *Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798 (*Seelig*), the Court of Appeal explained that, as a matter of constitutional law, a statement must imply a provably false factual assertion in order to serve as the basis of a defamation action:

> "'Statements do not imply a provably false factual assertion and thus cannot form the basis of a defamation action if they cannot "'reasonably [be] interpreted as stating actual facts' about an individual." [Citations.] Thus, "rhetorical hyperbole," "vigorous epithet[s]," "lusty and imaginative expression[s] of . . . contempt," and language used "in a loose, figurative sense" have all been accorded constitutional protection. [Citations.]' [Citation.] The dispositive question . . . is whether a reasonable trier of fact could conclude that the published statements imply a provably false factual assertion." (*Id.* at p. 809.)

The *Seelig* court outlined the process courts use in determining whether or not a statement implies a provably false factual assertion:

> "To ascertain whether the statements in question are provably false factual assertions, courts consider the '"totality of the circumstances."' [Citation.] '"First, the language of the statement is examined. For words to be defamatory, they must be understood in a defamatory sense . . . . [¶] Next, the context in which the statement was made must be considered. . . . [¶] This contextual analysis demands that the courts look at the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed."' [Citation.] This crucial question of whether challenged statements convey the requisite factual imputation is ordinarily a question of law for the court." (*Seelig, supra,* 97 Cal.App.4th at pp. 809-810.)

"[A] subjective judgment of the person making the statement" is not one that implies a provably false factual assertion. (*Gallagher v. Connell* (2004) 123 Cal.App.4th 1260, 1270; *Carver v. Bonds* (2005) 135 Cal.App.4th 328, 348 [concluding statements were nondefamatory because they were based on "entirely subjective matters rather than provably false factual assertions"].) For example, in *Copp v. Paxton* (1996) 45 Cal.App.4th 829, 837, the court noted that other courts have regarded as nondefamatory any "'broad, unfocused and wholly subjective comment,' [citation] such as that the plaintiff was a 'shady practitioner' [citation], 'crook' [citation], or 'crooked politician' [citation]."

In *Jensen v. Hewlett-Packard Co.* (1993) 14 Cal.App.4th 958 (*Jensen*), the court applied these principles in considering whether a supervisor had made potentially defamatory statements about an employee in the employee's performance evaluation. The *Jensen* court described the employee's defamation action as follows:

> "In a nutshell, the lawsuit involves a difference of opinion between an employer and an employee about the quality of the employee's work. A Hewlett-Packard supervisor, Hank Phelps, evaluated the employee, Jensen, as needing to improve his on-the-job performance in certain respects. Jensen took offense at the evaluation, claimed it was false, and accused Phelps of trying to hide his own incompetence." (*Id.* at pp. 963-964.)

In the performance evaluation, Phelps made the following statements concerning Jenson's "attitude toward his job responsibilities and his coworkers" (*Jensen, supra*, 14 Cal.App.4th at p. 971):

> "Phelps said Jensen had not 'increased his skill' in project definition and control; was not 'pulling his weight' in meeting various sales objectives; appeared to lack concern for management's need for

13

information; had 'weak' knowledge of project management and process control; showed 'lack of direction, inflexibility and lack of dependability' causing 'unnecessary' delays in projects and 'finger-pointing'; had a productivity 'perceived as low' due to his 'lack of personal ownership of tasks'; displayed 'questionable judgment' in pursuing personal 'vindication' concerning 'behavioral problems' and in breaching confidentiality of personnel matters between him and Phelps; did not 'extend' himself by giving 'a helping hand or pitching in'; projected an 'attitude of if it's not my job, it's your problem'; displayed a 'lack of attention' to tasks and 'overall communication with the team'; and was the subject of a 'tremendous amount of negative feedback.'" (*Id*. at p. 971, fn. 14.)

The *Jensen* court held that none of the statements in the evaluation could "reasonably be interpreted as false statements of fact[s]." (*Jensen, supra*, 14 Cal.App.4th at p. 970.) The *Jensen* court reasoned that the evaluation "documented one manager's assessment of Jensen's work habits, interpersonal skills and level of effort, and . . . outlined the employer's expectations with regard to Jensen's improvement," and stressed that the statements were made in an evaluative context. (*Ibid*.)

1. *The statements at issue are not defamatory because they cannot reasonably be interpreted as implying provably false factual assertions*

Schimsky asserts the comments made by Higgins concerning his statements and demeanor in class and during office visits were defamatory based upon the circumstances under which they were made. Schimsky also asserts that the comments made by Higgins were defamatory because (1) they falsely asserted he discriminated against on the basis of her age and "nontraditional status," and (2) they falsely attribute to Schimsky attributes that exposed him to contempt and ridicule.

We reject these contentions.

14

In considering the " ' "totality of the circumstances," ' " we first consider " ' "the language of the statement[s]." ' " (*Seelig, supra,* 97 Cal.App.4th at p. 809.)  Higgins's statements cannot reasonably be construed as implying a provably false factual assertion. Rather, they only suggest a general, subjective, overall assessment of his workplace abilities.  The statements are far less specific and have far less potential to be interpreted as containing factual content than the statements held to be nondefamatory in *Jensen.* The language of the statements only reflect broad, subjective, evaluative commentary regarding Schimsky's workplace performance.

With respect to " ' "the nature and full content of the communication" ' " and "the audience to whom the publication was directed" (*Seelig, supra,* 97 Cal.App.4th at pp. 809-810), Schimsky claims that Higgins made the statements to members of USD's executive body in an attempt to have him terminated.  As with the language of the statements, the context in which the statements are alleged to have been made indicate that the statements were intended as a subjective assessment of Schimsky's workplace abilities and that they are not provably false factual assertions.  (See *Jensen, supra*, 14 Cal.App.4th at p. 970.)

Moreover, Higgins's statements do not, as Schimsky asserts, accuse him of discrimination.  Discrimination requires a showing that a person was subjected to disparate treatment, such as an adverse action due to age, sex or race.  (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354-355; *Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 714.)

15

However, Higgins's statements do not demonstrate facts showing that she was subjected to any "disparate treatment." They do not state that her test papers, quizzes or class assignments were graded any differently.

At most, the statements by Schimsky could be considered to ostracize older students. However, mere ostracism does not amount to discrimination. (*Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 615.)

B. *The Defense of Privilege*

Because we have concluded that the statements made by Higgins were not defamatory, we need not, and do not, address her contention that they were privileged statements under sections 47(b) and (c).

DISPOSITION

The judgment is affirmed.

NARES, J.

WE CONCUR:

BENKE, Acting P. J.

IRION, J.

16