Filed 9/24/21  Sterling v. County of Sacramento CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| JUVONI STERLING,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>COUNTY OF SACRAMENTO,<br><br>Defendant and Appellant. | C089616<br><br>(Super. Ct. No. 34-2016-00197058-CU-OE-GDS)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed on September 7, 2021, be modified as follows:

Delete the second full paragraph on page 36 that begins with "Although the court," and insert the following paragraph in its place:

1

Although the court excluded the posttermination complaint and HR's investigation report, the County was allowed to elicit testimony that Sterling filed a posttermination complaint and that HR investigated that complaint. As to the evidence that was excluded, including the report itself, the trial court reasonably concluded that the probative value was outweighed by the probability that their admission would necessitate undue consumption of time and create substantial danger of undue prejudice, of confusing the issues, and invading the jury's province.

This modification does not change the judgment.
The petition for rehearing is denied.


BY THE COURT:


     RAYE     , P. J.


     DUARTE     , J.


     KRAUSE     , J.

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| JUVONI STERLING, | C089616 |
| Plaintiff and Respondent, | (Super. Ct. No. 34-2016-00197058-CU-OE-GDS) |
| v. | |
| COUNTY OF SACRAMENTO, | |
| Defendant and Appellant. | |

Defendant County of Sacramento (the County) released plaintiff Juvoni Sterling (Sterling), an African-American woman, from her position as a probationary building inspector.  Sterling sued the County for damages, alleging race and gender discrimination, retaliation, failure to prevent retaliation and discrimination, and defamation.  After a five-week trial, the jury returned a verdict in Sterling's favor on her race discrimination, retaliation, failure to prevent, and defamation claims, awarding her $450,001 in damages.  The County moved for judgment notwithstanding the verdict

1

(JNOV) and for a new trial. The trial court denied both motions and awarded Sterling attorney fees in the amount of $1,113,750.

The County now appeals the judgment, the denial of the JNOV motion, and the fee award, arguing the trial court applied the rules of evidence in an arbitrary and uneven manner that allowed Sterling to build her case upon impermissible and prejudicial evidence, while denying it the ability to meaningfully respond or challenge Sterling's credibility. The County contends the court's evidentiary rulings were so flawed and one-sided that it was deprived of its right to a fair trial. Thus, it requests that we reverse the judgment, vacate the fee and costs awards, and order a new trial. In the alternative, the County contends we should reverse the denial of its JNOV motion based on insufficiency of the evidence to support the verdicts and other grounds.

We conclude that the County's challenges to the court's evidentiary rulings either lack merit or were harmless error. We also conclude the trial court correctly denied the JNOV motion on the discrimination, retaliation, and failure to prevent claims and reject the County's contention that the fee award was excessive and improperly calculated. We agree, however, that the court erred in denying the JNOV motion on the defamation claim. We therefore reverse the judgment solely as to that count, and otherwise affirm.

BACKGROUND FACTS AND PROCEDURE

The County first hired Sterling to work as a building inspector in 1999. She performed commercial electrical inspections for the County until 2004, when she voluntarily left for a different job. At the time of her separation, Sterling was classified as a Building Inspector-2, range B (or BI-2B), paid at "step 9" of the salary schedule.

In 2015, Sterling sought to be rehired by the County after she moved back to Sacramento. The County had an opening for a BI-2, range A (or BI-2A) in the Building Permits and Inspection (BPI) division of the Department of Community Development

2

(the Department).[1]  Russ Williams (Williams), a principal building inspector (section manager) who remembered Sterling from her previous term with the County, encouraged her to apply and recommended her to the director of the Department.

Sterling interviewed with a three-person panel consisting of supervisors Bob Ivie (Ivie) and Shawn Rodgers (Rodgers) and principal building inspector Chuck Iniguez (Iniguez).  Sterling scored well, receiving the second highest score of the four applicants.

Sterling then had a second interview with Brian Washko (Washko), the chief building official and head of the BPI division.  During her interview with Washko, Sterling asked what her assignment would be, and was told that she would be assigned to work under supervisor Ivie, performing commercial electrical inspections out of the downtown office.

The County had the option to hire Sterling either to a temporary position, or to a permanent position, which would require her to complete a six-month probationary period.  BPI had two temporary and two permanent positions available.  The County hired Sterling and another employee into the two permanent positions.  Brandon James (an African-American) and Phil Lanoie (a Caucasian) were hired into the temporary positions.

*Sterling requests an advanced pay step*

County policy dictates that new employees generally must begin at the lowest pay step for the classification range.  There is an exception when an employee is rehired to a former position within three years of separation, but the exception did not apply to Sterling because she had been separated from County service for more than three years.  Nevertheless, before accepting the offer for the BI-2A position, Sterling attempted to negotiate a higher starting wage, one at least equal to the salary she previously earned as

---

[1]      BPI only uses range A, and there is no way for a person applying to a BI-2 position within BPI to be in range B.

a BI-2B. Human resources (HR) liaison Kim Abel (Abel) advised Sterling that there were no BI-2B's in the BPI division and getting approval for an advanced pay step could be a lengthy process involving skills comparisons with other employees in the department, so she asked Sterling if she wanted to take the job pending a decision on the request. Sterling accepted the job.

After their conversation, Abel sent an e-mail to Washko seeking his approval to pursue an advanced step for Sterling. Washko responded approximately three minutes later, denying the request. Later that day or the next day, Abel called Sterling, told her that Washko had denied the request, and asked Sterling if she still wanted the job. Sterling, who already had given notice to her previous employer, said that she did.

*Sterling begins work as a commercial electrical field inspector*

*The reorganization of BPI*

On July 13, 2015, Sterling reported to supervisor Ivie to begin work as a commercial electrical field inspector.[2] The same day, Washko announced a reorganization of BPI.

BPI historically was organized into two main sections: commercial and residential. The commercial section was responsible for industrial projects, hotels, offices, retail, and multifamily residential, while the residential section was responsible for one- and two-family residential dwellings. The commercial section was located downtown, and managed by principal building inspector Williams, a Caucasian.[3] The residential section was located in an office on Goethe Road (the Goethe office), and managed by principal building inspector Iniguez, a Hispanic/Latino.

---

[2]    Sterling testified that the County was not ready for her arrival as it did not have a home retention vehicle or code books for her.

[3]    The commercial section was moved downtown as part of a 2014 reorganization. Most of the employees involved in that reorganization were Caucasian.

4

The principals (Williams and Iniguez) reported to the division chief above them (Washko), and managed the supervisors beneath them (Ivie, Rodgers et al.).  The supervisors oversaw the building inspectors and engineering technicians, all of whom were designated as counter workers, plan reviewers, or field inspectors.  Counter workers assisted customers at the public counter.  Plan reviewers reviewed applicant plans to ensure compliance with building codes.  And field inspectors checked the actual work performed to ensure safety and compliance with the plans and building codes.

Because commercial projects tended to be more complex, commercial field inspections historically were assigned by trade:  electrical, structural, mechanical, or plumbing.  In contrast, residential field inspections covered all trades, sometimes referred to as "combo" inspections.

The July 13 reorganization announcement involved the creation of a new light commercial combination inspection team (or "light combo team"), which, unlike other commercial inspections, would cover all building trades.  The asserted rationale for the light combo team was that it would increase efficiency by reducing costs and delays associated with less complicated commercial inspections.

*Sterling is reassigned to the light combo team*

With the reorganization, Sterling was reassigned from her position as a commercial electrical field inspector, supervised by Ivie, to the newly created light combo team, supervised by Greg Stowe (Stowe), a Caucasian.  Shortly after the reorganization was announced, Stowe approached Sterling, leaned in while smiling, and said, "[Y]ou're working for me now."[4]  Shortly thereafter, Sterling told Ivie that the news made her feel sick.

---

[4]    Ivie testified that he believed Stowe, who claimed to report directly to Washko and was promoted by Washko without a competitive interview process, may have played a role in deciding who was selected for the light combo team.

Three other employees, all Caucasian, also were assigned to the light combo team. They were Phil Lanoie (Lanoie), a newly hired temporary employee who, like Sterling, had been hired to be a commercial building inspector; James (Ed) Reeves (Reeves), a former residential field inspector; and Paul Kukulka (Kukulka), a former counter worker with no field inspection experience. Caucasian commercial inspectors Wayne Eastman (Eastman) and Scot Johnston (Johnston), both of whom had experience performing combo inspections, were not reassigned to the light combo team and continued to perform commercial inspections by trade.

*Sterling is unhappy about her new assignment*

Because the reorganization did not take effect until July 27, Sterling worked for Ivie during her first two weeks of employment. Ivie had no complaints about Sterling's work performance while he supervised her. When the reorganization took effect, Sterling began working for Stowe on the light combo team. She was unhappy about the change. Sterling suspected discrimination—that her commercial electrical assignment had been given to a less qualified Caucasian employee. Sterling voiced her dissatisfaction about the new assignment to Stowe and Ivie, telling them that she was hired as an electrical inspector and did not want to do combo inspections. Sterling believed she was being set up to fail by being assigned to perform combo inspections without additional training. Other inspectors heard Sterling complain about the light combo assignment. When fellow inspector Johnston offered to help her with structural inspections, Sterling declined the offer, stating she would not be doing combo inspections.

Although Sterling expressed discomfort at having to perform combo inspections without additional training, she acknowledged that she was qualified to do "minor" combo inspections. She also was not asked to do inspections for which she was not qualified. As a result, she had no problems completing her assignments.

6

*Sterling is assigned to counter work*

As a member of the light combo inspection team, Sterling sometimes was assigned to work the public counter. She spent about 24 percent of her time on the counter. Two Caucasian members of the light combo team—Reeves and Lanoie—spent less time on the counter than Sterling. Reeves did not work at the counter at all and Lanoie only worked the counter 13 percent of the time.[5] Kukulka, another Caucasian light combo team member, worked the counter more than Sterling, but he had no field inspection experience and had worked the counter for a year before the reorganization. Commercial inspectors Eastman and Johnston never worked the public counter.

Sterling resented being assigned to work the counter. She regarded counter work as punitive and remedial. It made her feel discriminated against because she was hired to do commercial inspections. Supervisor Ivie acknowledged that working the counter is less desirable and that when he was a building inspector he considered counter work a demotion. Building inspector Johnston agreed that counter work is undesirable. Principal Williams did not consider the counter to be punitive, but he admitted that counter work typically was done by engineering technicians and that field inspectors usually did not like it.

*Sterling complains about discrimination*

On July 27, the day the reorganization took effect, Sterling observed that all the minority employees in the residential section at the Goethe office were being relocated to the downtown office. The relocated employees were: Iniguez, a Hispanic/Latino principal building inspector who managed the residential section of BPI; Rodgers, an African-American supervisor; Genice Arnold (Arnold), an African-American BI-2; Carla

---

[5]     The County presented evidence that Lanoie was removed from counter work and assigned to the field to replace an injured inspector, and that he returned to counter work after the injured worker recovered.

7

Brown (Brown), an African-American engineering technician; and Michelle Carter (Carter), an African-American counter worker.

The relocated employees were assigned to a newly created production housing team. Most of the relocated employees had been responsible for certain production housing functions at the Goethe office before the reorganization. Carter had been supervised by Rodgers but, as a counter worker, she had not been involved in production housing functions.

The reorganization adversely affected Rodgers, the only African-American supervisor, and Iniguez, the only minority manager. Before the reorganization, Rodgers worked at the Goethe office, supervised about 10 or 11 employees, and was responsible for residential plan review, master plans, and counter work. After the reorganization, Rodgers worked downtown, supervising initially just three people, although later one more person was added, but he no longer had responsibilities related to plan review or counter operations. When Iniguez worked at the Goethe office, he managed all the residential supervisors, including those responsible for field inspections and plan review. After the reorganization, Iniguez managed just two supervisors who were responsible for production housing and violations. The reorganization left no African-American or Hispanic employees at the Goethe office.

Both Rodgers and Iniguez testified that it made no business sense to relocate the employees downtown as all their functions could have been performed just as well at the Goethe office. Rodgers testified that Carter's relocation especially made no sense because she was a counter worker and, after the reorganization, he no longer supervised counter workers.

Rodgers also testified that as part of the relocation, he was assigned to a cubicle in the first floor counter area even though he no longer supervised the counter. Rodgers had been promised an office on the third floor, an office that was already occupied by Robert Logsdon (Logsdon), the counter supervisor, who is Caucasian. When asked by Washko

8

if he would be willing to trade offices with Rodgers, Logsdon said yes, but shortly thereafter Logsdon was told he could remain in the office after all. Eventually, the office swap did occur. The justification for initially denying Rodgers the third floor office was that Rodgers was too "loud."

Sterling was concerned that all the minority employees were moved downtown, while the nonminority employees remained at the Goethe office. To Sterling, it felt like segregation, as though they were bringing all the minorities to one location "so that they could . . . like keep an eye on them."

In July and August, Sterling expressed her concerns to Iniguez, on one occasion telling him, "Chuck, . . . if you were to throw a bomb, you would kill all of the brown people because they're like all in one exact location." Sterling also expressed concerns about discrimination related to (1) her assignment to the light combo team; (2) the amount of time that she was required to work the counter; (3) the County's failure to provide her with the training, tools, and equipment necessary for her to perform her job; and (4) the lack of diversity within BPI.

Other African-American employees also expressed concerns about race discrimination to Iniguez. In accordance with the County's antidiscrimination policy, Iniguez reported their complaints, including Sterling's, to HR and to chief building official Washko. HR analyst Mark Galimba (Galimba) responded to the report by supplying Iniguez a written form he could use to file a "formal complaint." On August 25, Iniguez declined to return the form, stating in an e-mail, "I have filed the same form once before and I do not have any confidence that my current issues can meet with any success in achieving resolution to the problems I have encountered within this organization." Iniguez suggested, however, that HR offer the same alternative to the

9

other individuals identified in his e-mail, including Sterling.[6]  The following day, HR director Randal Lee (Lee) forwarded Iniguez's e-mail to Mindy Scates-Gonzalez (Scates-Gonzalez), who headed an HR team responsible for investigating discrimination complaints.

Galimba contacted Rodgers, the supervisor of the relocated employees, who told Galimba that after discussing the matter with Washko and Iniguez, his concerns had been addressed.  Galimba sent letters to the other employees listed in the e-mail, including Sterling, providing each a written complaint form.

Neither Sterling nor any of the other named employees returned a completed complaint form.  At trial, Sterling testified that while she had concerns about submitting a written complaint, she would have explained her concerns verbally, if asked.  But Galimba never interviewed her or undertook any other efforts to investigate her concerns.[7]

On September 25, representatives from HR met with Washko for an informal discussion about the complaints surrounding the reorganization.  HR accepted Washko's explanation of the reorganization without any additional investigation.  Galimba admitted at trial that HR did not follow normal protocol with respect to investigating the complaints of discrimination reported by Iniguez.

---

[6]     The other individuals identified in Iniguez's e-mail were Rodgers, Arnold, Carter, Brown, and Andy Munyon.  Although Brandon James's name was not included in Iniguez's e-mail, Iniguez testified that he told Washko that James had complained as well.

[7]     At trial, the County suggested that it did not have sufficient information about Sterling's complaints to commence an investigation, but the County's witnesses admitted it is not necessary for employees to fill out a formal written complaint for HR to initiate an investigation.  Scates-Gonzalez testified that even verbal complaints generally should receive some form of investigation.

10

*HR's investigation of Logsdon's complaint*

Around the same time that Iniguez complained to HR, supervisor Logsdon sent a letter to HR expressing concerns about a conversation he had with Iniguez about the reorganization. Even though Logsdon stated in his letter he did not want to file a "formal complaint," HR promptly investigated his concerns by, among other things, interviewing Iniguez about the "inappropriate conversation" he had had with Logsdon regarding the relocation of staff being "racially motivated on the part of senior management."

*Sterling is accused of using a cell phone while driving*

In an e-mail to Washko on August 18, 2015, Jeff Gasaway (Gasaway), then the County's deputy director of general services, reported that on August 13, 2015, at approximately 6:30 a.m., he saw the driver of county vehicle number 131-516—the vehicle assigned to Sterling—using a cell phone while driving. Gasaway described the driver as a "female African[-]American."

On August 20, Washko sent an e-mail to Williams, with a copy to Stowe, directing Williams to counsel Sterling about using her phone while driving and to document it in writing.

Stowe subsequently spoke with Sterling about the cell phone incident. According to Stowe, Sterling denied she was on her cell phone and "shoved [her] phone" in his face. Sterling later spoke with Williams about the incident. Williams testified that Sterling was "amped up" and "defensive," "emphatically trying to show [him] she [had] not [been] on the phone."

At trial, Sterling testified that when confronted by Stowe about the cell phone incident, she merely turned her phone around so Stowe could see it, but that he made no effort to take her phone or look at it. She also produced her personal cell phone records to prove that she was not on her phone at the time claimed. The County's witnesses admitted that they did not do anything to determine if Sterling was telling the truth, such

11

as checking her call history, timesheets, or work cell phone records. One County witness also testified that using a cell phone while driving was not itself grounds for termination.

*Stowe begins process to release Sterling from probation*

On or about September 8, Stowe spoke with Ivie about the possibility of releasing Sterling from probation. Ivie, Stowe, and Williams then met to discuss the matter. Ivie did not think Stowe's concerns—about her reluctance to do the assigned duties and other issues that had happened up to that point—were sufficient to justify Sterling's release. Williams, who had a strained relationship with Stowe, a person in whom he "did not have a lot of faith," also was opposed to her release. They decided to observe Sterling and give her time to adjust.

On the morning of September 15, Stowe assigned Sterling to spend the day working with the residential inspection team. His e-mail to the residential supervisors stated, "I asked [Sterling] to come spend the day with your crew . . . . I am doubtful you will, but[ ] if you receive resistance please let me know. Her other option for the day was to work the counter."

Later that same day, Stowe sent an e-mail to Ivie attaching a draft performance evaluation for Sterling. It stated that Sterling "needs improvement" in the areas of decisionmaking/judgment, dependability, and job knowledge. Stowe specifically commented that Sterling "appears to be very knowledgable [*sic*] with the duties of an electrical inspector," but that "there appears to be resistance to the duties of a 'combinat[io]n inspector.' " He also stated that he "would like [Sterling] to try and work more of the field issues without consulting her supervisor(s)." Stowe's overall rating of Sterling was "[n]eeds [i]mprovement." Stowe never provided the evaluation to Williams, even though Williams was the commercial section manager.

On or about September 16, 2015, Stowe asked HR for help in starting the process to release Sterling from probation. The following day, HR analyst Lori Kleczka (Kleczka) sent Stowe a "memo template" based on their discussion. The template

12

identifies as performance issues: (1) a specific incident when Sterling was observed using a cell phone while driving her assigned county vehicle, and then became "argumentative and unprofessional" when confronted about it, and (2) a general "unwillingness to accept and perform assignments" and "unprofessional" attitude. Kleczka asked Stowe to "flesh out, as much as possible, examples of [Sterling's] unprofessional communication, objections to assignments or unwillingness to perform work assigned."

From September 17, to September 29, 2015, Stowe and HR exchanged versions of the release memorandum, documenting additional reasons for Sterling's release.

*Assigning inspections using the ACCELA database*

Stowe testified that he counseled Sterling on assigning inspections to herself in the County's ACCELA database. He testified that Sterling was resistant and preferred to have other inspectors enter her inspections into ACCELA for her. Stowe testified that despite his instructions, on September 21, 2015, Sterling did not assign inspections to herself in ACCELA.

Sterling denied that Stowe counseled her on any aspect of her work or performance. Sterling testified that, in fact, she approached Stowe about how he could more efficiently assign light combo inspections. Sterling testified that she did not enter her assignments into ACCELA on September 21 because Stowe, despite knowing that she had jury duty, gave her the assignments late, leaving her no time to put the assignments into the system.

*Complaints from contractors*

Ivie testified that he received complaints from contractors about Sterling and forwarded them to Stowe. On August 17, one contractor, Greg Lutz, complained that his projects with Sterling had "gone sideways quickly" and that she had accused him of "making a racial remark or gender remark . . . ." In late September, another contractor,

13

Jesse Singh, complained that Sterling was "unprofessional" and "threw her weight around." At trial, Singh described Sterling as "unprofessional" and "difficult."

Iniguez testified that Singh complained to him on the phone while Sterling was at the job site. Iniguez subsequently spoke to Sterling on the phone during the incident, however, and Iniguez could hear Singh in the background being extremely argumentative, threatening, and demeaning to Sterling. Both Iniguez and Sterling testified that Sterling had good working relationships with contractors. Sterling also presented evidence that complaints from contractors are common for building inspectors.

*The Eastman incident*

On September 18, 2015, Sterling had a "negative interaction" with commercial electrical inspector Eastman. During a casual conversation with other inspectors, Sterling stated that she was proud of her strict interpretation of the code, and Eastman commented to her something to the effect of, "[T]o [a] fault." According to Ivie, who witnessed the interaction, Sterling took offense and became aggressive, angry, and hostile. Ivie thought Sterling's behavior was unprofessional and that her inability to self-regulate was concerning, but he did not intercede. Eastman likewise described Sterling as "aggressive" and "angry." He testified that her body language was "hostile" and "combative," and that it seemed like she wanted to provoke a fight, but he denied that Sterling "squared off" or did anything physical. Eastman described her actions as "verbal violence."

Lanoie entered the room during the incident, heard Sterling "yelling" and "very upset" with Eastman and he felt like he had walked into something "pretty big." James, who also observed the incident, agreed that Sterling was "upset," but he testified that no one was yelling and he did not see Sterling physically "square off" against Eastman. James testified that such differences of opinion between inspectors were not unusual and that he did not find Sterling's actions to be unprofessional.

Sterling admitted that during the incident with Eastman, she probably talked louder than usual, but denied she was angry. She described her questioning of Eastman as "inquisitive." She testified that she was confused by Eastman's criticism of her because she had never worked with him.

Ivie testified that a few days after the incident, he confronted Sterling about it, and found her to be stubborn and defensive. Ivie thought Sterling was the aggressor and that she should apologize to Eastman, but Sterling did not think she had any reason to apologize. Ivie testified that Sterling's response to the Eastman incident caused him to change his mind about her release. Shortly thereafter, Ivie discussed the Eastman incident with Stowe. Later that day, Stowe sent Ivie a draft of his request to release memorandum.

*Sterling is released from probation*

At some point during the week of September 21, Stowe met with Ivie and Williams to discuss Sterling's proposed release. At the meeting, Ivie told Williams about the Eastman incident, describing Sterling as having "squared up" to Eastman in a "threatening" manner. Although Ivie had described Sterling's conduct as "less than workplace violence," Williams understood it to be "close" to workplace violence.

Williams testified that he trusted Ivie, so when Ivie told him about the Eastman incident, he decided that Sterling should be released. Williams testified that he alone made the decision to release Sterling, even though Lori Moss (Moss), as the department head, had to approve the release, and Washko also had to consent.

The final version of the release memorandum was circulated internally among Moss, Washko, Stowe, and HR, but not Williams. The memorandum identified the following reasons for Sterling's release: (1) her use of a cell phone while driving; (2) her unprofessional behavior when asked about using a cell phone while driving; (3) her failure to assign inspections to herself on September 21, despite a prior directive to do so; (4) her general unwillingness to accept and perform her assignment as a light combo

15

inspector; (5) feedback from other inspectors (namely, Eastman and Johnston) that she becomes defensive and difficult to work with when advice is offered; and (6) contractor complaints that she is difficult to work with. Washko authorized Stowe to sign Sterling's release letter in his absence. Sterling was officially released by the County on October 1, 2015.

*Sterling's civil complaint and jury trial*

Sterling received a copy of the release memorandum for the first time in February 2016 as part of her Civil Service Commission appeal. In July 2016, she filed a government tort claim (Gov. Code, § 810 et seq.)[8] against the County alleging that she was "defamed by employees, supervisors and managing agents" of the County after she complained of discriminatory conduct. Sterling claimed that the defamation began in September 2015 and continued thereafter, and that the defamatory statements were "initiated" by Stowe, who conspired with others to cover up the discrimination and retaliation.

On July 8, 2016, Sterling sued the County. Her first amended complaint alleged claims for retaliation, race discrimination, and failure to prevent discrimination and retaliation under the Fair Employment and Housing Act (§ 12940 et seq.) (the FEHA), as well as defamation.[9] A five-week trial was held in February 2019, during which nearly 30 witnesses testified.

*Plaintiff's theory at trial*

In support of her retaliation claim, Sterling relied on evidence showing that she engaged in a protected activity by complaining of discrimination to her employer; that

---

[8]     Undesignated statutory references are to the Government Code.

[9]     Sterling also alleged that she was subjected to gender discrimination. However, because the jury found no gender discrimination, and that finding was not appealed, we have omitted facts relating to that claim.

her employer knew she made such complaints; that her discrimination complaints were not investigated; and that shortly after complaining, she was terminated, giving rise to an inference that the termination was in retaliation for her complaints.

Although Stowe, who pushed for her release, denied knowledge of Sterling's discrimination complaints, Sterling argued that circumstantial evidence showed that Washko used Stowe to facilitate the retaliation. Sterling presented evidence that Washko and Stowe had a very close working relationship; that Stowe was promoted by Washko without a competitive interview process; and that Stowe socialized with Washko outside of work, attended Washko's weddings, and had Thanksgiving dinner with him. Stowe admitted that he had a direct line of communication to Washko, and that they had at least two discussions about Sterling before her release. Sterling argued that when Stowe initiated the process to release her from probation in early September, he did so at the behest of Washko. Sterling argued that Ivie helped Stowe because Ivie was opportunistic and was seeking a promotion to become the assistant building official. Sterling argued that Williams approved the release because he was manipulated by Ivie's misrepresentations about the Eastman incident.

In support of her discrimination claim, Sterling argued that the County subjected her to adverse employment actions on account of her race by: (1) denying her request for a starting wage commensurate with her experience; (2) denying her equipment and tools (e.g., code books) necessary for her to do her job; (3) setting her up to fail by assigning her to perform light combo inspections without adequate training; (4) giving her undesirable assignments without a valid business reason; and, ultimately, (5) terminating her employment.

To demonstrate that the adverse employment actions were motivated by discriminatory animus, Sterling relied on the following evidence:

1.      African-Americans were underrepresented in the division and Sterling was the only African-American field inspector.

2.       Despite a strong need for complex electrical field inspectors, Sterling, an experienced commercial electrical inspector, was assigned to the light combo team, while Eastman and Johnston, Caucasians with prior experience performing combo inspections, continued to work as commercial electrical inspectors.  In fact, Sterling was the only employee with significant commercial inspection experience assigned to the light combo team.

3.       As a member of the light combo team, Sterling frequently was given the undesirable assignment of working the public counter.  With the exception of Kukulka, who had no field inspection experience and who had worked the counter before the reorganization, the other Caucasian members of the light combo team worked the counter less than Sterling.  Caucasian inspectors Reeves, Eastman, and Johnston never were assigned to work the counter.

4.       The County's proffered reasons for Sterling's termination were pretextual, as shown by evidence that (i) the reasons cited by the County were untrue, in that Sterling did not use a cell phone while driving, did not confront Eastman in a threatening manner, was not unwilling to accept assignments, and was not unprofessional or difficult to work with; (ii) releases from probation were rare; (iii) the County did not follow its usual protocol when preparing the memo for Sterling's release; (iv) the County violated its policies by failing to give Sterling any performance evaluations or formal feedback before her release (other than counseling her about using a cell phone while driving); and (v) there was disparate treatment in how HR handled the complaint by Logsdon, a Caucasian, and as compared to how it handled Sterling's discrimination complaint.

Sterling also relied on testimony regarding retaliation and discrimination perceived by other employees.  Both Iniguez and Rodgers described interactions with Stowe that they believed to be racially motivated.  Iniguez testified that Stowe had conflicts with people of color "on a routine basis," and refused to take directions from him, which he believed to be racially motivated.  Rodgers testified that Stowe treated him

18

with hostility and that he believed it was racially motivated because Stowe seemed to single him out. Rodgers testified that he had seen Stowe be condescending and demeaning to people of color, but had not seen Stowe act the same way with Caucasians. Iniguez testified that he too had concerns about Stowe's treatment of Rodgers and other people of color.

Both Rodgers and Iniguez also testified that they believed the reorganization, and the related reduction of their duties, were racially motivated. Iniguez testified that Washko did not like "being around people of color." Rodgers described an incident in early September 2015, after the reorganization, when Washko said he had "heard through the grapevine" that African-Americans were having lunch together and asked if they were discussing complaints of racial discrimination against him. When Rodgers asked why African-Americans meeting together should cause concern, Rodgers testified that Washko became agitated and abruptly ended the conversation.[10]

Rodgers testified that on a different occasion, in early September 2015, Washko came into his office to discuss Iniguez. Washko told Rodgers that he "expect[s] all [his] staff to be loyal to [him]." Rodgers responded that he was just going to "do the right thing," to which Washko responded, "[D]oing the right thing can get you in trouble as well."

Building inspector Arnold testified that it made no sense to relocate the employees who moved from the Goethe office to the downtown office. Her job, for example, required her to work with residential field inspectors, who remained at the Goethe office. There likewise was no reason to transfer Carter downtown since he was not part of the production housing unit. Arnold also complained that she was denied training.

---

[10]    Arnold testified that Washko also asked her why all the "black people were having lunch together," and wanted to know if it was some sort of conspiracy or whether they were preparing to sue him.

19

Brown testified that she had concerns about the reorganization because all of the employees who remained at the Goethe counter after the transfer were Caucasian. When asked if she felt like the reorganization resulted in all the minorities being "tucked in the back of the office downtown," Brown answered in the affirmative.

James, who was hired at the same time as Sterling, testified that Washko made him uncomfortable during his initial job interview, as though Washko did not want him to be there. In contrast, when Washko interviewed Lanoie, a Caucasian, Washko was welcoming. James testified that he had been told he would be allowed to go out in the field and do inspections, but that did not happen. Instead, James was assigned to the public counter downtown with lower level engineering technicians. James also testified that after he was hired, Washko had trouble recalling his name and forgot to include him on group e-mails.

In support of her failure to prevent discrimination/retaliation claim, Sterling presented evidence to show that even though HR knew about her discrimination complaints, HR did not investigate or ensure that her release was not retaliatory.

Sterling's defamation claim was based upon (1) the statements made by Stowe in the release memorandum that Sterling is unprofessional, defensive, and difficult to work with, as well as (2) verbal statements made by Ivie to Williams that Sterling "squared up" to Eastman in an intimidating and aggressive manner and engaged in conduct "close to workplace violence." Sterling argued that both sets of statements were false and malicious.

*The County's defense case*

The County argued there was no evidence to show any adverse action was taken against Sterling because of her race or in retaliation for complaints of discrimination.

Although Sterling was unhappy about certain aspects of her job, the County argued that the FEHA is not violated by workplace changes that are merely contrary to an employee's interest or not to the employee's liking. The County argued that Sterling's

complaints about her working conditions—her starting wage, her delays in receiving tools and equipment, her reassignment to the light combo team, the lack of formal training, her work on the public counter—were trivial and did not qualify as a substantial adverse change in the terms and conditions of her employment.

In addition, the County argued there was no evidence that Sterling was discriminated against because of her race. Rather, it argued, the evidence showed that Sterling was treated as well as, or better than, her Caucasian colleagues.

Any perceived bias in the denial of her request for a higher starting wage was misplaced because it was the County's policy to start new employees at the lowest pay step. Sterling was not entitled to a higher step due to her long break in service, and she accepted the job knowing that her request had been denied. Sterling did not provide any evidence that Washko had approved a higher starting wage for any similarly situated Caucasian employees.

Sterling complained that she had to wait for her home retention vehicle and code books, but Sterling was one of the first new hires to receive a home retention vehicle, and she received her vehicle before Lanoie, a Caucasian, received his. Ordering code books was a lengthy process and many inspectors were waiting for them. In the meantime, Ivie loaned Sterling an electrical code book and assigned Sterling a computer tablet through which she could access the codes online. Sterling also could borrow code books from shared sets housed within BPI.

Sterling suspected that she was reassigned to the light combo team because of her race, but everyone else assigned to the team was Caucasian. The new assignment did not set her up to fail because the County reasonably believed Sterling could handle it based on the experience and qualifications she listed on her job application. Further, Sterling admitted she was not asked to perform any inspections for which she was not qualified, and the lack of formal training (for Sterling or anyone else on the light combo team) did not affect her ability to complete her work assignments.

21

Sterling may have believed that working the public counter was undesirable, but she knew that BI-2's could be assigned to work the counter. The County presented evidence showing that Caucasian employees also were required to work the counter, including at least two Caucasian members of the light combo team: Lanoie and Kukulka. Both Kukulka and Sterling's supervisor, Stowe, worked the counter more than Sterling.

Because Sterling was a probationary employee, the County argued it did not have to show good cause for her release. She could be released for any reason, good or bad, provided the reason was not unlawful. In this case, the County argued it had legitimate business reasons for her release, namely, that she was confrontational, defensive, difficult to work with, unprofessional, and resistant to her new assignment, as observed by her supervisors, coworkers, and customers.

The County argued that Sterling failed to show the proffered reasons for her release were false or pretextual. The County denied that it violated its policies and procedures in the investigation of her complaints or the handling of her release.

The County argued that Sterling's proof of discriminatory animus relied on the testimony of the "me too" witnesses, who expressed subjective perceptions of racism based on events having little or nothing to do with Sterling. The "me too" witnesses were unhappy about the reorganization, but the County presented evidence showing that many Caucasian employees also were unhappy about the reorganization. Further, the County argued the factual backgrounds of the "me too" witnesses were not sufficiently similar to establish discriminatory animus against Sterling.

The County argued that Sterling's retaliation claim failed because the persons who actually decided to release her—Williams, Ivie, and Stowe—were unaware she had engaged in any protected activity. The County characterized as a speculative "conspiracy" theory Sterling's argument that Washko was somehow "pulling the strings" to retaliate against Sterling because she complained about discrimination.

22

Because there purportedly was no evidence of discrimination or retaliation, the County argued there also was no basis for Sterling's claim based on a failure to prevent discrimination or retaliation. The County further argued that Sterling's defamation claim lacked merit because the allegedly defamatory statements were not actionable and were, in any event, true.

*The verdict and posttrial motions*

The jury returned a special verdict in Sterling's favor on her race discrimination, retaliation, failure to prevent, and defamation claims.

The jury voted nine to three that (1) Sterling's complaint of alleged discrimination was a substantial motivating reason for the County's decision to discharge her from employment; (2) Sterling's race was a substantial motivating reason for one or more of the adverse employment actions taken against her; and (3) the County failed to take reasonable steps to prevent the discrimination and retaliation against her. The jury voted 12 to zero that Stowe and Ivie made the allegedly defamatory statements about Sterling and that they were statements of fact, not opinion. The jury voted nine to three that the defamatory statements were not substantially true and that the statements were made with malice. The jury awarded Sterling $360,000 in economic damages and $50,000 in noneconomic damages for the FEHA claims. The jury awarded her $1 in nominal damages for the defamation, plus $40,000 for shame, mortification, and hurt feelings.

The County moved for JNOV and for a new trial. The trial court denied both motions. It then awarded attorney fees in the amount of $1,113,750, with a lodestar amount of $742,500 and a 1.5 multiplier.

DISCUSSION

I

*The Trial Court's Evidentiary Rulings*

The County challenges the trial court's evidentiary rulings, contending the court applied the rules of evidence in an arbitrary and uneven manner that allowed Sterling to

23

build her case using impermissible and prejudicial proof, while excluding admissible, probative defense evidence. The County contends the court's evidentiary rulings were so flawed and one-sided that it was deprived of its right to a fair trial. We disagree.

A.     *Standard of review*

We review any ruling by a trial court as to the admissibility of evidence for abuse of discretion. (*City of Ripon v. Sweetin* (2002) 100 Cal.App.4th 887, 900.) "This standard is not met by merely arguing that a different ruling would have been better. Discretion is abused only when in its exercise, the trial court 'exceeds the bounds of reason, all of the circumstances before it being considered.' [Citation.]" (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 281.) " ' "In the absence of a clear showing that its decision was arbitrary or irrational, a trial court should be presumed to have acted to achieve legitimate objectives and, accordingly, its discretionary determinations ought not . . . be set aside on review." [Citation.]' [Citation.]" (*Ajaxo Inc. v. E\*Trade Group Inc.* (2005) 135 Cal.App.4th 21, 45.) It is the appellant's burden to establish an abuse of discretion. (*Shaw, supra*, 170 Cal.App.4th at p. 281.)

In this appeal, the County identifies several evidentiary rulings that it contends, individually and cumulatively, prevented a fair trial and resulted in a miscarriage of justice. We consider each of these contentions separately.

B.     *The "me too" witnesses*

Before trial, the County moved in limine to preclude Sterling from calling current and former employees to testify regarding discrimination or retaliation they experienced while working for the division (the so-called "me too" witnesses). After a hearing, the trial court granted the motion to exclude some of Sterling's proposed "me too" witnesses, but the court allowed Sterling to present "me too" testimony from Iniguez, James, and Rodgers, plus two of the following three employees: Arnold, Brown, and Carter. The County contends this was an abuse of discretion and the court should not have allowed any "me too" witnesses to testify. We find no abuse of discretion.

24

To prevail under a disparate treatment theory of employment discrimination, the plaintiff must show that the employer acted with discriminatory intent. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354, fn. 20 (*Guz*); *Soria v. Univision Radio Los Angeles, Inc.* (2016) 5 Cal.App.5th 570, 590.) A plaintiff may prove discriminatory intent using either direct or circumstantial evidence. (*Soria, supra*, at p. 591.) Because direct evidence of intentional discrimination is rare, the plaintiff usually must rely on circumstantial evidence to prove discriminatory animus. (*Guz, supra*, at p. 354.)

Such circumstantial proof of discrimination may include evidence that other employees were subjected to discriminatory conduct by the employer, commonly referred to as "me too" evidence. Although inadmissible to prove an employer's propensity to discriminate, "me too" evidence is admissible when it is relevant to prove some other fact, such as a discriminatory motive or intent. (Evid. Code, § 1101, subds. (a) & (b); *Johnson v. United Cerebral Palsy/Spastic Children's Foundation* (2009) 173 Cal.App.4th 740, 759-767 (*Johnson*).)

The County does not dispute that "me too" evidence is admissible when relevant and not unduly prejudicial. The County argues, however, that the "me too" evidence in this case should have been excluded because the witnesses were not similarly situated to Sterling and their testimony was therefore unduly prejudicial. We are not persuaded.

As the United States Supreme Court has explained, "me too" evidence is neither *per se* admissible nor *per se* inadmissible. (*Sprint/United Management Co. v. Mendelsohn* (2008) 552 U.S. 379, 388 [170 L.Ed.2d 1, 9] (*Sprint/United*); *Johnson, supra*, 173 Cal.App.4th at pp. 766-767.) Admissibility of such evidence requires a "fact-intensive, context-specific inquiry" in each case. (*Sprint/United, supra*, at p. 388; accord, *Johnson*, at p. 767.) Even when nonparties allege discrimination at the hands of persons who played no role in the adverse employment decision challenged by the plaintiff, the evidence still may be admissible, depending on "how closely related [it] is to the plaintiff's circumstances and theory of the case." (*Sprint/United*, at p. 388; accord,

25

*Johnson*, at pp. 766-767; *Pantoja v. Anton* (2011) 198 Cal.App.4th 87, 95, 115-118 [rejecting ruling that "me too" evidence must take place in plaintiff's presence or otherwise affect the plaintiff's work].)

*Johnson, supra*, 173 Cal.App.4th 740, lies at one end of the spectrum. In *Johnson*, a woman who claimed that her employer fired her because she was pregnant sought to present "me too" evidence from other employees who worked at the same office under the same supervisors as the plaintiff, and alleged they too were fired for being pregnant. (*Johnson*, at pp. 745-747, 759.) The Second District Court of Appeal, Division Three, ruled that the trial court erred in excluding the "me too" evidence because the factual scenarios of the other employees were, as a matter of law, sufficiently similar to the one presented by plaintiff to meet the relevance and Evidence Code section 352 standards. (*Id*. at p. 767; accord, *Pantoja v. Anton, supra*, 198 Cal.App.4th at pp. 114-122 [concluding evidence of defendant's sexual harassment of other female employees was admissible to show defendant harbored a discriminatory intent or gender bias].)

At the other end of the spectrum is *Pinter-Brown v. Regents of University of California* (2020) 48 Cal.App.5th 55. *Pinter-Brown* involved a suit filed by a former clinical professor against the University of California at Los Angeles (UCLA) School of Medicine alleging gender discrimination. (*Id*. at pp. 59-60, 64.) The trial court, after delivering a presentation highlighting important figures in the civil rights movement, allowed the plaintiff to present evidence on the contents and conclusions of a report documenting an investigation of racial and ethnic discrimination at the UCLA campus, as well as nearly 200 discrimination complaints from across the entire University of California system, only four of which involved complaints of gender discrimination at UCLA. (*Id*. at pp. 59, 89-94.) The jury found in favor of Dr. Pinter-Brown and awarded her upward of $13 million in damages. (*Id*. at p. 59.) The Second District Court of Appeal, Division Eight, reversed, concluding that the trial court denied UCLA a fair and impartial trial by allowing the jury to consider (1) the contents of an irrelevant and highly

prejudicial report addressing discrimination outside the plaintiff's protected class, and (2) the extensive list of anonymous and undefined complaints against the University of California system without evidence of the factual scenarios underlying the complaints or their relationship to the circumstances or theory of plaintiff's case. (*Id.* at pp. 94-98.)

The facts in this case lie between the extremes of *Johnson* and *Pinter-Brown*. Based on the facts presented at the in limine hearing, the court allowed Sterling to present testimony from several "me too" witnesses about perceived racial bias relating to the July 2015 reorganization, unfavorable work assignments, and delays in receiving necessary tools or equipment. Although the "me too" witnesses held different jobs and had different direct supervisors, they all worked in the same division, under the same leadership (Washko), and they all believed that people of color had been treated less favorably than other employees because of their race. Even if the fact patterns underlying the testimony of the "me too" witnesses were somewhat different than Sterling, the test we must apply is whether the trial court abused its discretion in allowing them to testify. This high standard is not met in this case.

The County objects that the "me too" evidence of racial discrimination was based *entirely* on subjective feelings and speculation, but this is not true. The "me too" witnesses testified that, as African-Americans and other people of color, they were adversely affected by Washko's reorganization. Both Rodgers and Iniguez testified that they believed the reorganization and the reduction of their duties was racially motivated. Rodgers and Iniguez also testified that they had seen Stowe be condescending and demeaning to people of color, but had not seen him act the same way with Caucasians. Other "me too" witnesses also testified that, like Sterling, they had been given undesirable assignments and denied necessary tools, training, or equipment. Their testimony supported Sterling's theory that there was a culture of discrimination within the

27

division against African-Americans and other people of color. Whether their suspicions of racism were founded was a question for the jury.[11]

The County argues that Rodgers's "me too" testimony exceeded the scope of what was allowed by the trial court's limine ruling: a "narrow time frame" overlapping with the period that Sterling worked there. The record does not support the County's argument. At the hearing on the limine motion, Sterling's counsel stated that she intended to elicit testimony from Rodgers for the timeframe of 2014 through 2015. This was the timeframe discussed at the limine hearing, and it coincides with the timeframe for his testimony at trial. In any event, the court made clear that its ruling on the limine motion could be revisited at trial, which is what occurred. When the County objected at trial, the court overruled the objection at sidebar, allowing Sterling to ask Rodgers about his interactions with Stowe in 2014. We find no abuse of discretion.[12]

The County likewise argues that Iniguez's trial testimony exceeded the scope of the court's limine ruling. Relying on *Hatai v. Department of Transportation* (2013) 214 Cal.App.4th 1287, 1298 (*Hatai*) (overruled on unrelated grounds as stated in *Williams v. Chino Valley Independent Fire Dist.* (2015) 61 Cal.4th 87, 115), the County argues Iniguez should not have been allowed to testify as a discrimination "me too" witness because he is not African-American and therefore not a member of the same protected

---

[11] While we agree that a witness's opinion about another person's discriminatory motivation is not substantial evidence of that motivation, we disagree that it is improper for a witness to explain why he or she believes a challenged action was discriminatory. To the extent the "me too" witnesses exceeded this limitation, and speculated about the discriminatory motives of others, it was incumbent on the County to object to that testimony during trial. The County has failed to show that it did so. Instead, it makes generalized arguments blaming the judge for failing to limit the testimony of the "me too" witnesses.

[12] To the extent the County contends that the "me too" testimony of witnesses other than Iniguez or Rodgers exceeded the scope of the court's limine ruling, the County has failed to support the contention with adequate argument and citation to the record.

28

class as Sterling. There are at least three flaws in this argument. First, as the County acknowledges, the court allowed Iniguez to testify as a "me too" witness with respect to the retaliation claim. For purposes of a "me too" retaliation claim, it is not necessary for a "me too" witness and the plaintiff to be in the same "protected class," it only matters whether they both engaged in sufficiently similar "protected activity." (§ 12940, subd. (h); *McCoy v. Pacific Maritime Assn.* (2013) 216 Cal.App.4th 283, 297-298.)

Second, *Hatai* is distinguishable on its facts. As discussed above, there is no bright line rule governing the admissibility of "me too" evidence. (*Sprint/United, supra*, 552 U.S. at p. 388; *Johnson, supra*, 173 Cal.App.4th at pp. 766-767.) The test of admissibility is fact based and depends on many case-specific factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case. (*Johnson*, at p. 767.) In *Hatai*, the plaintiff pleaded his case as an "anti-Asian case," and therefore the court ruled he could not present "me too" evidence of discrimination against employees outside of that protected class. (*Hatai*, *supra*, 214 Cal.App.4th at p. 1298; cf. *Abramson v. American University* (June 13, 1988, Civil Action No. 86-1413) 1988 U.S.Dist. LEXIS 15818, at *4 [evidence of discrimination against other minority groups is relevant to show discriminatory intent].) In contrast, here Sterling alleged that defendants engaged in a pattern and practice of discriminating against "minority employees and giving preferential treatment to Caucasians." Thus, it was not an abuse of discretion to allow Iniguez to testify about discrimination he experienced working in the BPI division.

Third, Iniguez was not just a "me too" witness; he also was a percipient witness for the retaliation claim. Iniguez's testimony was critical to Sterling's claim that she engaged in a protected activity by complaining about the 2015 reorganization being racially biased.

Fourth, the County failed to object to Iniguez's testimony until the morning *after* Iniguez testified that (1) Stowe routinely had conflicts with people of color; (2) Stowe

was a bully; and (3) that Stowe was reluctant to accept direction from him, which he felt was racial. Thus, even if the court had sustained the County's belated objection, some of the challenged testimony would have been admitted. For all of these reasons, we find no abuse of discretion.

C.     *Defense counsel's letter to county employees*

We also reject the County's argument that the court abused its discretion by allowing "me too" witness Arnold to "vilify" defense counsel. The County's summary of Arnold's testimony omits critical facts.

When Arnold took the stand, Sterling's counsel asked her if she was in court pursuant to a subpoena. Arnold answered in the affirmative. Counsel then asked Arnold, "Are you afraid of any retaliation?" Arnold answered, "Yes, I am." Arnold was asked if defense counsel ever asked her not to speak to Sterling's attorney. Arnold answered, "Only through an e-mail after I had already spoken to you." Sterling's counsel then asked to mark for identification exhibit 70, an e-mail dated January 10, 2019, from defense counsel to Arnold and others instructing county employees not to communicate with Sterling's attorney. Sterling's counsel provided copies of exhibit 70 to Arnold, the judge, and defense counsel.

After exhibit 70 was marked for identification, Sterling's counsel showed it to Arnold and asked her if she recognized it. Arnold recognized the e-mail. Sterling's counsel requested to publish the exhibit. The court, hearing no objection, granted the request and Sterling's counsel began to question Arnold about the exhibit. After several questions, defense counsel requested a sidebar and objected to the exhibit on relevance grounds. The court overruled the belated objection, and the following exchange occurred:

"[Sterling's counsel:]  After reading [exhibit 70], how did that make you feel?

"[Arnold:]  I was freaked out.

"[Sterling's counsel:]  Okay. Why were you freaked out?

30

"[Arnold:] Because I had already spoken to you before this e-mail was sent.

"[Sterling's counsel:] So you were concerned they may come after you or retaliate against you?

"[Arnold:] I thought I would get in trouble because I had already spoken to you, and then I got this so I didn't know. You know, I was confused, actually, and afraid."

The next day, defense counsel objected to Arnold's testimony on the ground it improperly insinuated that defense counsel was involved in witness intimidation. Defense counsel moved for a mistrial, which the court denied.

In the end, exhibit 70 was not admitted into evidence. It also was not discussed by Sterling's counsel during closing argument. The court declined to strike Arnold's testimony or give a curative instruction because (1) it did not find Sterling's use of the exhibit to be improper; (2) the exhibit was not admitted into evidence; and (3) the proposed instruction seemed unnecessary, counterproductive, and potentially prejudicial to opposing counsel. The court gave the jury a general instruction not to consider exhibits that were not admitted into evidence.

Under these circumstances, we find no abuse of discretion. The County failed to timely object to the exhibit. After publication, the trial court reasonably decided that even if the exhibit had limited probative value, its use was not improper and publication was harmless, serving chiefly to support Arnold's existing testimony that she was afraid of retaliation. The court did not agree that the exhibit unjustly "vilified" counsel. The court's reasoning was sound.

In any event, any error in refusing to strike the challenged testimony or give the requested curative instruction was harmless. It is not reasonably probable that the County would have received a more favorable result at trial had Arnold's testimony been stricken or the requested instruction been given. (*Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 447; *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 570.)

31

D.      *Sterling's prior work history*

At trial, Sterling argued that the County's stated reasons for her termination—that she was unprofessional, resistant to work assignments, defensive, and difficult to work with—were defamatory and pretextual.  In support of her argument, Sterling presented evidence of her prior work history with the County, including testimony that she was "personable" and "congenial," that she had "excellent customer service skills," and that she maintained good working relationships with her supervisors and peers.  The court allowed this evidence on the grounds it was relevant to why the County rehired Sterling and why Sterling requested a higher rate of pay for the position.

In defense, the County sought to use Sterling's intervening work history (with other employers) to rebut any inference that she was an "exemplary" employee.  In particular, the County sought to introduce evidence that as recently as 2014, the year before her return to Sacramento County, Sterling was released from probationary employment by Santa Clara County because of her unprofessional behavior, resistance to training, condescending attitude, and aggressive demeanor towards customers, coworkers, and supervisors.  The trial court excluded this evidence based on sections 352 and 1101, subdivision (a) of the Evidence Code.[13]

On appeal, the County argues the trial court erred in excluding the evidence because Sterling's character was an ultimate fact at issue in the litigation.  We are unpersuaded.

Although we agree character evidence may be admissible when the person's character is an ultimate fact in dispute (*Carr v. Pacific Tel. Co.* (1972) 26 Cal.App.3d

---

[13]     The court did not foreclose the possibility that aspects of Sterling's intervening work history could be admissible on the issue of reputational damages on the defamation claim.  Before trial, the court bifurcated the issue of reputational damages for defamation.  After the liability phase of trial, Sterling waived her right to reputational damages.

32

537, 544), we do not agree that Sterling placed her entire character at issue merely by filing her lawsuit. Sterling was not terminated because she is an "unprofessional" or "difficult" person outside her employment with the County; she was terminated because she ostensibly engaged in unprofessional conduct and was difficult to work with *while employed by the County*. Sterling challenged the lawfulness of her termination, contending that this description was untrue, and that her release actually was motivated by retaliation and discrimination. Under these circumstances, we fail to see how Sterling's work performance with a different employer can be considered a central issue in the case. Rather, it seems clear that the County sought to admit evidence of Sterling's work history to prove that she conducted herself in the same way while employed by the County, which is precisely what Evidence Code section 1101, subdivision (a) is designed to prevent.

The County argues that Sterling's work history—particularly her history of short-term jobs—was probative on the issue of how long she would have continued to work for the County if she had not been terminated. However, the trial court did not prohibit the County from relying on Sterling's prior work history for the purpose of calculating damages. The trial court ruled that the County's expert could consider such information in forming an opinion as to how long Sterling would have worked for the County had she not been released. Later, during trial, the County informed the court that its damages expert had not relied on Sterling's prior work history in formulating his opinion, and that "no expert" would opine on how long Sterling would have remained with the County.

The County argues that Sterling's prior work history should have been admitted for purposes of calculating her damages, regardless of whether the evidence was considered by its expert. But even if we assume Sterling's work history was relevant, the trial court correctly concluded that its probative value was minimal and substantially outweighed by the probability that its admission would necessitate undue consumption of time or create substantial danger of confusing the issues or misleading the jury. (Evid.

33

Code, § 352.) As Sterling's counsel explained, if the County presented evidence that Sterling previously was released from probation, the court effectively would have been required to hold a mini-trial on what happened at her prior employment. The court was well within its discretion in excluding the evidence on this basis.

The County further argues that Sterling's prior work history should have been admitted because it was relevant to impeach claims that Sterling was an "exemplary" employee who had a good working relationship with her peers and supervisors. This argument fails because it is not supported by the record. The court expressly allowed the County to use Sterling's prior work history for impeachment. We find no abuse of discretion.

E. *Sterling's job application*

The County also argues the trial court abused its discretion by excluding the job application Sterling submitted to the County. The County contends the application was relevant to the credibility of Sterling's claim that she was "set up to fail" by being asked to perform inspections in trades outside her qualifications. The County misstates the record and overstates the importance of the job application to its defense. What was relevant was not the application itself, but Sterling's representations about her qualifications. During cross-examination, defense counsel quoted a portion of Sterling's job application and asked Sterling if, based on the quoted material, it was "reasonable for the County to believe that [she] had experience in other trades besides electrical?" Sterling answered, "Yes. It's what I just read. Certainly." Based on Sterling's admission, there was nothing to impeach. Thus, even if we assume the court erred in excluding the job application, it was unquestionably harmless.

F. *County's pay data table*

Sterling argued at trial that the County discriminated against her by denying her request for a higher rate of pay (advanced step commensurate with her experience). The County sought to defend this claim by introducing a pay data table which showed that no

full-time BI-2A hired under Washko was approved to start at an advanced step. The trial court excluded the table on relevancy grounds, reasoning that the other employees were not similarly situated absent evidence they too requested a higher rate of pay.

On appeal, the County argues the trial court abused its discretion in excluding the pay data table. Even if we agreed that the court erred in excluding the table, we would find the error harmless. The jury heard testimony that (1) it was County policy to hire employees at the lowest step; (2) Sterling was not entitled to reinstatement at the higher step due to her long break in service; (3) the County has no obligation to pursue an employee's request for a higher step; (4) a request for a higher step is granted only for an employee with "extraordinary qualifications;" and (5) when a request is granted, any employees with similar qualifications also must be advanced to the higher step. The jury did not hear any testimony that Caucasian employees with qualifications equal or lesser than Sterling's were approved for a higher step. The County emphasized these points during closing argument. Against this background, we conclude it is not reasonably probable that the County would have received a more favorable result at trial had the pay data exhibit been admitted. The error was harmless.

G. *Plaintiff's posttermination complaint and the ensuing investigation report*

At trial, Sterling challenged the County's HR department as being racially biased in its handling of employee complaints. Sterling argued that HR only investigated complaints made by Caucasian employees and retaliated against minority employees who complained. As support for her claim, Sterling pointed to the disparity between how HR responded to the complaint of Caucasian employee Logsdon, versus how it responded to her verbal complaint about the reorganization.

In defense, the County presented evidence that it did not investigate Sterling's verbal complaint because she did not complete and return a written complaint form provided to her by HR. The County also sought to present evidence that (1) after her termination, Sterling completed and returned the written complaint form provided to her

35

by HR, and that (2) HR then promptly and thoroughly investigated her complaint, culminating in a 265-page investigation report. The trial court excluded this evidence under Evidence Code section 352.

The County contends that excluding Sterling's posttermination complaint and HR's subsequent investigation was an abuse of discretion. The County contends the evidence was highly probative because it directly contradicted Sterling's claim that HR was racially biased, only investigating complaints made by Caucasian employees. We find no abuse of discretion.

Although the court excluded the posttermination complaint and HR's investigation report, the County was allowed to elicit testimony that Sterling filed a posttermination complaint and that HR investigated that complaint. Only the documents were excluded. As to those, the trial court reasonably concluded that the probative value was outweighed by the probability that their admission would necessitate undue consumption of time and create substantial danger of undue prejudice, of confusing the issues, and invading the jury's province.

The County argues that it was prohibited from using the documents for purposes of impeachment, but the record belies that argument.

H.     *Plaintiff's Department of Labor complaint*

In addition to her posttermination complaint to HR, Sterling filed a complaint with the United States Department of Labor (the "DOL complaint") alleging that she was unlawfully released from employment because of her military status. The trial court excluded the DOL complaint, stating that Sterling's initial thoughts about why she was terminated—before she received the County's articulated reasons—were not relevant. The County contends this was error, but the County fails to provide any legal authority other than a general citation to Evidence Code section 780. The unsupported argument is insufficient to meet its burden to show that the trial court abused its discretion, and so we reject it.

I.     *Cumulative prejudice*

The County argues that the cumulative effect of the various individual errors warrants reversal.  Having rejected all but one of the individual claims of error, which we found was not prejudicial, we necessarily reject the claim that the cumulative effect of the errors requires reversal.  Even if we also consider the assumed potential errors, there were no serious errors and it is not reasonably probable the jury would have reached a different result.

II

*The County's Motion for JNOV*

A.     *Race discrimination*

After the jury returned its verdict, the County moved for JNOV on the discrimination claim based on insufficiency of the evidence.  The trial court denied the motion.  On appeal, the County contends the trial court erred by denying its JNOV motion because there is no substantial evidence that Sterling was treated differently than other employees because of her race.

Sterling responds that the County is trying to compartmentalize the evidence of discrimination, rather than examine the totality of the employer's actions.  Based on the totality of the circumstances, Sterling argues there is substantial evidence to support the race discrimination verdict.  We agree with Sterling and conclude that the trial court did not err in denying the County's JNOV motion.

A trial court's power to grant a JNOV is identical to its power to grant a directed verdict.  (*Hauter v. Zogarts* (1975) 14 Cal.3d 104, 110.)  The trial judge cannot weigh the evidence or judge the credibility of witnesses.  (*Ibid.*)  A JNOV motion may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict.  (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 770.)

37

On appeal from the denial of a JNOV motion, we determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's verdict. (*Cabral v. Ralphs Grocery Co., supra*, 51 Cal.4th at p. 770.) We must consider the evidence in the light most favorable to the prevailing party and indulge all legitimate and reasonable inferences to uphold the verdict. (*Stubblefield Construction Co. v. City of San Bernardino* (1995) 32 Cal.App.4th 687, 703.) If there is substantial evidence to support the jury's conclusion, we must affirm the denial of the motion. (*Montijo v. Western Greyhound Lines* (1963) 219 Cal.App.2d 342, 349.)

The FEHA makes it unlawful for an employer to discharge a person from employment, or discriminate against a person in the terms, conditions, or privileges of employment, based on the person's race. (§ 12940, subd. (a).) There are generally two types of FEHA employment discrimination cases: disparate treatment and disparate impact. (*Jones v. Department of Corrections & Rehabilitation* (2007) 152 Cal.App.4th 1367, 1379 (*Jones*).) Sterling's claim is based on a disparate treatment theory.

In analyzing claims of discrimination or retaliation under the FEHA, California courts have long applied the three-stage burden-shifting test established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 [36 L.Ed.2d 668]. (*Arnold v. Dignity Health* (2020) 53 Cal.App.5th 412, 424 (*Arnold*).) The *McDonnell Douglas* test reflects the principle that direct evidence of intentional discrimination is rare, and that such claims usually must be proved circumstantially. (*Guz, supra*, 24 Cal.4th at p. 354.) "Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained." (*Ibid.*)

Under the *McDonnell Douglas* test, the plaintiff has the initial burden to establish a prima facie case of discrimination. (*Arnold, supra*, 53 Cal.App.5th at p. 424.) If the plaintiff establishes a prima facie case, a rebuttable presumption of discrimination arises. (*Ibid.*) The burden then shifts to the employer to rebut the presumption by presenting

evidence of a legitimate reason for the adverse employment action.  (*Id*. at p. 425.)  If a legitimate reason is provided, the plaintiff has the burden to show that the employer's stated reason was a mere pretext for discrimination.  (*Ibid*.)

A plaintiff may establish pretext either by showing that discriminatory animus more likely motivated the adverse action, or indirectly by showing that the employer's proffered explanation is unworthy of credence.  (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 68.)  Proof that the defendant's explanation is unworthy of credence often considerably assists proving that the real reason was intentional discrimination.  (*Reeves v. Sanderson Plumbing Prods.* (2000) 530 U.S. 133, 147 [147 L.Ed.2d 105, 119].)  "[O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation . . . ."  (*Ibid*.)  Thus, evidence that the employer's proffered explanation is false, considered together with the elements of the prima facie case, may permit a finding of unlawful discrimination.  (*Arnold, supra*, 53 Cal.App.5th at p. 425, quoting *Guz, supra*, 24 Cal.4th at p. 356.)

A prima facie case of discrimination based on disparate treatment is "a set of circumstances that, if unexplained, permit an inference that it is more likely than not the employer intentionally treated the employee less favorably than others on prohibited grounds."  (*Jones, supra*, 152 Cal.App.4th at p. 1379; accord, *Arnold, supra*, 53 Cal.App.5th at p. 424.)  In a typical case, this burden is met by showing that (1) the plaintiff was a member of a protected class; (2) the plaintiff was qualified for the position or was performing competently in the position held; (3) the plaintiff suffered an adverse employment action; and (4) there were circumstances suggesting the employer acted with a discriminatory motive.  (*Guz, supra*, 24 Cal.4th at p. 355; accord, *Jones*, at p. 1379.)

Here, we have little trouble concluding that Sterling satisfied the first three prongs of this test.  She presented substantial evidence showing that she is a member of a protected class based on her race, that she was qualified for the position for which she

was hired, and that she suffered a substantial adverse change in her employment by virtue of her termination.[14]

Sterling also provided evidence from which a reasonable trier of fact could infer, under all the circumstances, that there was discriminatory animus against Sterling and other people of color.  Such evidence included:  the underrepresentation of African-Americans in the division; Sterling's status as the only African-American field inspector; Sterling's reassignment to the light combo team, despite the County's acknowledged need for more commercial electrical field inspectors; that the Caucasian commercial inspectors, Eastman and Johnston, both of whom had prior experience performing combo inspections, were not assigned to the light combo team; that Sterling was given the undesirable assignment of working the counter more than the Caucasian members of her team, save one, who had no field inspection experience; that the reorganization relocated every minority employee in the residential section of the Goethe office and reduced the duties of the only African-American supervisor; the disparate treatment between the handling of Logsdon's "informal" complaint about Iniguez and Sterling's complaint about the reorganization; and that Sterling was released from probation even though releases from probation were rare.

Sterling's proof also included the "me too" evidence that the reorganization adversely affected Rodgers, Iniguez, and the other minority employees who believed it was racially motivated; Iniguez believed Washko did not like being around people of color; Washko expressed concerns that the African-American employees were meeting to discuss complaints of racial discrimination against him; Washko's interviews made

---

**14**    A reasonable trier of fact also might conclude that Sterling's reassignment to the light combo team constituted an adverse employment action because it was reasonably likely to impair her job performance and prospects for promotion within the division. (*Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, 1455; *McCoy v. Pacific Maritime Assn., supra*, 216 Cal.App.4th at pp. 298-299.)

James feel unwanted but made Caucasian Lanoie feel welcomed; after James was hired, Washko forgot James's name and forgot to include him on group e-mails; James was denied the opportunity to go out in the field and perform inspections; Arnold was denied the training necessary to become a field inspector; Stowe treated Rodgers with hostility and Rodgers believed it was because of his race; and Stowe was seen to be condescending and demeaning to people of color, but not to Caucasians.[15]

In addition, to further support a nexus between the discriminatory animus and the adverse employment actions taken against her, Sterling provided evidence that Stowe seemed to know about the reorganization before it was announced and that Ivie believed Stowe played a role in deciding who was selected for the light combo team. She provided evidence showing that Washko and Stowe had a very close working and personal relationship; that Washko and Stowe had at least two discussions about her before her release; and that Stowe was directly involved in, and heavily influenced, the decision to release her, bypassing Williams. Sterling also relied on Stowe's comment to her, shortly after the reorganization was announced, that "you're working for me now." Under the totality of the circumstances, a reasonable juror could interpret Stowe's statement as evidence of racial animus directed towards Sterling.

Despite this evidence, the County argues that the verdict cannot stand because Sterling presented no evidence that she was treated less favorably than similarly situated Caucasian employees. This is factually incorrect. As discussed above, Sterling presented evidence that she was the only experienced commercial electrical field inspector assigned to the light combo team, and that similarly situated Caucasian inspectors Eastman and Johnson were not. She also presented evidence that, as a member of the light combo team, she was required to work the counter while other, Caucasian inspectors were not

---

[15] Although we agree with the County that subjective opinion about another person's motive is not substantial evidence, the "me too" evidence was not so limited.

required to work the counter at all. And there was evidence suggesting disparate treatment by HR in the handling of the complaint filed by Logsdon as compared to the handling of her complaint.

Moreover, a plaintiff is not required to point to a similarly situated comparator to succeed on a discrimination claim, provided the plaintiff can point to other evidence establishing that the adverse employment action was taken for discriminatory reasons. (*Heard v. Lockheed Missiles & Space Co.* (1996) 44 Cal.App.4th 1735, 1753-1755; *Bryant v. Aiken Regional Medical Centers, Inc.* (4th Cir. 2003) 333 F.3d 536, 545.) Nor is a plaintiff required to prove that discriminatory animus was the *sole* reason behind the challenged adverse employment action. (*George v. California Unemployment Ins. Appeals Bd.* (2009) 179 Cal.App.4th 1475, 1492; *Mixon v. Fair Employment & Housing Com.* (1987) 192 Cal.App.3d 1306, 1319.) The plaintiff merely needs to prove by a preponderance of the evidence that discrimination was a substantial motivating factor behind the adverse action. (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 232; Cal. Code Regs., tit. 2, § 11009, subd. (c).) Here, Sterling presented substantial evidence sufficient for a reasonable trier of fact to infer that discrimination was a substantial factor motivating the adverse employment actions against her.

Although the County articulated legitimate business reasons for Sterling's termination, Sterling provided evidence sufficient for a reasonable jury to conclude that the proffered reasons for her termination were false (or at least highly exaggerated) and a pretext for discrimination.[16] The County's evidence is not so strong that no rational fact

[16] Such evidence included that Sterling did not refuse to assign inspections to herself, did not talk on a cell phone while driving, was not "unprofessional" when asked about using the cell phone, did not refuse to accept and perform her assignment as a light combo inspector; and had good working relationships with coworkers and customers. She also provided evidence that the County initiated her release before most of the events described in the release memorandum took place. In addition, she provided evidence showing that the County did not follow its normal protocols in pursuing her release.

42

finder could draw a contrary inference.  Considering all the evidence in the light most favorable to the verdict, and presuming the existence of every fact the jury could reasonably deduce from the evidence, we conclude that there is substantial evidence to support the jury's discrimination verdict.

B.      *Retaliation*

The County contends the trial court erred by denying its JNOV motion because the uncontroverted evidence showed that the relevant decision makers were not aware Sterling engaged in any protected activity.  We disagree.

Section 12940 of the FEHA prohibits retaliation by an employer against any person because the person (1) opposed practices forbidden by the FEHA, or (2) filed a complaint, testified, or assisted in any proceeding under the FEHA.  (§ 12940, subd. (h); *Sada v. Robert F. Kennedy Medical Center* (1997) 56 Cal.App.4th 138, 155.)

To establish a prima facie case of retaliation, a plaintiff is required to show that he or she engaged in a protected activity, that he or she was thereafter subjected to an adverse employment action, and that there was a causal link between the two.  (*Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 614.)  " 'The causal link may be established by an inference derived from circumstantial evidence, "such as the employer's knowledge that the [employee] engaged in protected activities and the proximity in time between the protected action and allegedly retaliatory employment decision." ' [Citation.]" (*Id.* at p. 615; accord, *Morgan v. Regents of University of California, supra*, 88 Cal.App.4th at p. 69.)

---

Combined with the uncontradicted evidence that releases from probation were rare, the evidence was sufficient to support an inference of improper retaliatory motive.  (*Kotla v. Regents of University of California* (2004) 115 Cal.App.4th 283, 294, fn. 6 [significant deviation from ordinary personnel procedures may support inference of retaliation]; see also *Village of Arlington Heights v. Metropolitan Housing Corp.* (1977) 429 U.S. 252, 267 [50 L.Ed.2d 450, 466] [departures from normal procedures might afford evidence that improper purposes are playing a role], superseded by statute on unrelated grounds as stated in *Chapman v. Nicholson* (N.D.Ala. 1984) 579 F.Supp. 1504, 1514.)

43

Sterling contends she proved retaliation by showing that (1) she complained about discrimination; (2) Washko and other decision makers learned of her discrimination complaint; (3) she was terminated shortly thereafter; and (4) the employer's proffered reasons for her termination were false and a pretext for retaliation.

The County argues the retaliation verdict is not supported by substantial evidence because Williams alone made the decision to release Sterling, and there is no evidence that Williams knew Sterling had complained about discrimination. We conclude, however, that substantial evidence supports Sterling's contention that Williams was not the sole decision maker.

Contravening Williams's testimony that he alone made the decision is evidence showing that Stowe initiated the termination in early September, and that Williams was (largely) kept in the dark. All communications with HR concerning Sterling's release went through Stowe, not Williams. Further, in violation of normal protocol where the manager, Williams, would make the recommendation, Stowe prepared the request for release memorandum and sent it directly to Washko. Further, when Washko was unavailable to sign the release request, he authorized Stowe, not Williams, to sign on his behalf. In short, the evidence shows that even if Williams made the decision to release Sterling, Stowe was heavily involved. (See *Husman v. Toyota Motor Credit Corp.* (2017) 12 Cal.App.5th 1168, 1188.)

The County argues that it is immaterial whether Stowe was a decision maker because he did not know about Sterling's discrimination complaint. Although Stowe *claimed* ignorance of Sterling's complaint, Sterling argues that circumstantial evidence supports a contrary finding. We agree.

The circumstantial evidence of Stowe's knowledge of the complaint includes the uncontradicted evidence that Washko was aware of Sterling's complaint by no later than early September; the close working relationship between Stowe and Washko; the testimony that Stowe seemed to be aware of management decisions (such as the

44

reorganization) before they became public; Stowe's admission that he had a direct line of communication to Washko; Stowe's admission that he had at least two discussions with Washko about Sterling before her release; the evidence that Stowe prepared the request for release memorandum and sent it directly to Washko, bypassing Williams; and the fact that Stowe began working on the release memorandum shortly after Sterling made her complaint.

The jury accepted Sterling's theory of the case and implicitly rejected Williams's testimony that he alone made the decision to release. Viewing the evidence in the light most favorable to the verdict, we conclude the evidence is sufficient to support the verdict. The totality of the evidence permits a rational inference that a retaliatory motive played a substantial role in Sterling's release. That a rational trier of fact also might have reached a contrary conclusion is not enough to reverse the verdict. (*Jameson v. Five Feet Restaurant, Inc.* (2003) 107 Cal.App.4th 138, 143 [when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trier of fact].)

C.    *Failure to prevent*

Relying on the principle that liability for failure to prevent discrimination or retaliation requires a finding of actual discrimination or retaliation, the County argues there is no substantial evidence to support the verdict on Sterling's failure to prevent claim. Because we have concluded there is substantial evidence to support the retaliation and discrimination verdicts, we reject the County's challenge to the failure to prevent claim.

D.    *Defamation*

The County contends the trial court also erred in failing to grant JNOV on Sterling's defamation claim, which was based on statements written by Stowe in Sterling's release memorandum and oral statements made by Ivie to Williams about the

45

Eastman incident.  The County argues that these statements are insufficient to support the defamation verdict.  We agree.

1. *Libel:  Stowe's statements in the release memorandum*

The jury found that Sterling was defamed when Stowe wrote in the final release memorandum that (1) Sterling was unprofessional and defensive, and that (2) he had received feedback from Johnston and Eastman that Sterling "becomes defensive and difficult to work with" when offered advice or assistance.  The County argues these statements are insufficient as a matter of law to support the jury's verdict because (1) they were subjective opinions; (2) they were based on true facts; (3) they were privileged under Civil Code section 47, subdivision (c); and (4) they were part of an employment performance evaluation and therefore not actionable under *Jensen v. Hewlett-Packard Co*. (1993) 14 Cal.App.4th 958 (*Jensen*).  We agree with the final contention and therefore do not reach the others.

Libel, one of two forms of defamation, is defined as a "false and unprivileged publication . . . which exposes [a] person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (Civ. Code, § 45.)  " 'A libel which is defamatory of the plaintiff without the necessity of explanatory matter . . . is said to be a libel on its face' [citation], or 'libelous per se' [citation]." (*ZL Technologies, Inc. v. Does 1–7* (2017) 13 Cal.App.5th 603, 623.)

Because the sine qua non of recovery for defamation is the existence of a provable falsehood, courts distinguish between statements of fact, which may be actionable as libel, and statements of opinion, which are constitutionally protected.  (*ZL Technologies, Inc. v. Does 1–7, supra*, 13 Cal.App.5th at p. 624.)  " 'That does not mean that statements of opinion enjoy blanket protection.  [Citation.]  On the contrary, where an expression of opinion implies a false assertion of fact, the opinion can constitute actionable defamation. [Citation.]' [Citation.]" (*Ibid*.)

46

The court first must determine, as a question of law, whether a statement is reasonably susceptible of a defamatory interpretation. (*Bently Reserve LP v. Papaliolios* (2013) 218 Cal.App.4th 418, 428.) If so, it is for the jury to determine whether a defamatory meaning was in fact conveyed to the listener or reader. (*Ibid.*)

In deciding whether a statement is reasonably susceptible of a defamatory interpretation, courts employ a totality of the circumstances test. (*Bently Reserve LP v. Papaliolios, supra*, 218 Cal.App.4th at p. 427.) The court must " 'put itself in the place of an average reader and determine the natural and probable effect of the statement . . . .' " (*Ibid.*) The court considers both the language of the statement and the context in which it was made. (*Ibid.*) The contextual analysis requires consideration of such factors as the nature and content of the communication, the purpose to be served, and the knowledge and understanding of the targeted audience. (*Ibid.*; accord, *Jensen, supra*, 14 Cal.App.4th at p. 970.)

In *Jensen, supra*, 14 Cal.App.4th 958, the court addressed whether negative comments in an employee's performance evaluation can support a cause of action for defamation. (*Id.* at pp. 963-964.) The employee in *Jensen* filed a claim for defamation after his supervisor gave him a written evaluation stating that he was not " 'pulling his weight,' " had a negative attitude in dealing with others, lacked direction, and displayed " 'questionable judgment.' " (*Id.* at pp. 966, 971, fn. 14.) The employee appealed the trial court's grant of the employer's motion for nonsuit. (*Id.* at pp. 968-969.)

On appeal, the *Jensen* court affirmed, holding that "unless an employer's performance evaluation falsely accuses an employee of criminal conduct, lack of integrity, dishonesty, incompetence or reprehensible personal characteristics or behavior [citations], it cannot support a cause of action for libel." (*Jensen, supra*, 14 Cal.App.4th at p. 965.) The court added that this is true even if the employer's perceptions of the employee were "objectively wrong" or made in bad faith. (*Id.* at pp. 965, 971; accord, *Gould v. Maryland Sound Industries, Inc.* (1995) 31 Cal.App.4th 1137, 1153-1154

47

[following *Jensen*].) The allegedly defamatory statements in Sterling's release memorandum—that she was unprofessional, defensive, and difficult to work with—did not accuse Sterling of criminal conduct, lack of integrity, dishonesty, incompetence or reprehensible personal characteristics or behavior. Thus, if *Jensen* applies, the statements in the release memorandum are not defamatory as a matter of law.

Citing *Reese v. Barton Healthcare Systems* (E.D.Cal. 2010) 693 F.Supp.2d 1170, the trial court distinguished *Jensen* on the ground that Sterling's release memorandum was not a "performance evaluation" used to improve Sterling's performance, but rather documentation of the factual basis for her termination. We do not read *Jensen* so narrowly and therefore find the trial court's reasoning unpersuasive. As the *Jensen* court explained: "In light of the multitude of laws designed to protect the employee from oppressive employment practices, evaluations serve the important business purpose of documenting the employer's hiring, promotion, *discipline and firing practices*." (*Jensen, supra*, 14 Cal.App.4th at p. 964, fn. omitted, italics added.) Thus, the *Jensen* court's holding applies to any "management tool for examining, appraising, judging and documenting" an employee's work performance. (*Id*. at p. 970.)

A request to release memorandum is an internal record whose business purpose is to document the reasons for an employee's release and is only produced to the employee if he or she appeals the decision. Thus, we conclude it was used as a management tool to document Sterling's performance, and the reasons for her release from probation, thus falling within the scope of the *Jensen* holding.

We find the reasoning of *Jensen* persuasive and conclude that the challenged statements in Sterling's release memo cannot support a cause of action for defamation.

2. *Slander: Ivie's statements about the Eastman incident*

In addition to the statements in the release memorandum, the jury also found defamation based on Ivie's oral statements to Williams that Sterling "squared up" to Eastman in a threatening manner and engaged in conduct "close to workplace violence."

48

The County argues that Ivie's statements are insufficient to support the verdict because (1) Sterling failed to comply with the Government Claims Act (§ 810 et seq.); (2) the statements were privileged under Civil Code section 47, subdivision (c); and (3) Sterling failed to prove the special damages necessary to support recovery for defamation per quod. We agree that Ivie's statements were not actionable because they were privileged.

"Under the 'common-interest privilege,' codified in Civil Code section 47, subdivision (c) [parenthetical omitted], a defendant who makes a statement to others on a matter of common interest is immunized from liability for defamation so long as the statement is made 'without malice.' " (*Lundquist v. Reusser* (1994) 7 Cal.4th 1193, 1196, fn. omitted.) This privilege applies where the communicator and the recipient have a common interest and the communication is reasonably calculated to protect or further that interest. (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 287.) The common interest "must be something other than mere general or idle curiosity, such as where the parties to the communication share a contractual, business or similar relationship . . . ." (*Ibid.*)

Communications made in a business setting relating to the conduct of an employee have been held to fall within the scope of the privilege. (*Cornell v. Berkeley Tennis Club* (2017) 18 Cal.App.5th 908, 949; *Deaile v. General Telephone Co. of California* (1974) 40 Cal.App.3d 841, 846.) " 'Clearly, an employer is privileged in pursuing its own economic interests and that of its employees to ascertain whether an employee has breached his responsibilities of employment and if so, to communicate, in good faith, that fact to others within its employ so that . . . appropriate action may be taken against the employee . . . .' [Citation.]" (*McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1538.)

Ivie's statements to Williams about the Eastman incident were made for the purpose of deciding whether Sterling should be released from probation, a matter of

49

common interest.  Thus, the statements were privileged and nonactionable unless they were made with malice.  (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 914-915.)

Malice is established by showing that the publication was motivated by hatred or ill will towards the plaintiff or by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and thereafter acted in reckless disregard of the plaintiff's rights.  (*McGrory v. Applied Signal Technology, Inc., supra*, 212 Cal.App.4th at p. 1538; *Hawran v. Hixson, supra*, 209 Cal.App.4th at p. 288.)  Recklessness is not measured by whether a reasonably prudent person would have made the statement.  Rather, there must be sufficient evidence to permit an inference that the defendant must have, in fact, subjectively entertained serious doubts as to the truth of the statement.  (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 256.)  It is a subjective test, under which the defendant's actual belief concerning the truth or falsity of the statement is the crucial issue.  (*Id*. at p. 257.)  The existence of malice is a question of fact for the jury.  (*McMann v. Wadler* (1961) 189 Cal.App.2d 124, 129.)

Here, the County contends there is no substantial evidence to support the verdict's finding that Ivie acted with malice.  The County argues there is no evidence that Ivie was motivated by hatred or ill will towards Sterling, and no evidence that Ivie subjectively entertained serious doubts as to the truth of his statements about the Eastman incident.

Sterling does not contest that there is no evidence of hatred or ill will, but argues that substantial evidence shows Ivie doubted the truth of his statements to Williams.  She argues that if Ivie truly believed Sterling "squared up" to Eastman in a threatening manner that was "close to workplace violence," Ivie would have intervened and then reported the incident as workplace violence.  However, Sterling is mischaracterizing Ivie's testimony.  Ivie never claimed that Sterling's conduct was "close to workplace violence."  He described Sterling as "loud," "angry," "aggressive," and "hostile," and testified that she was "pointing" and "gesturing," but he never felt that she was going to hit Eastman.  Williams testified that when Ivie reported the incident to him, Ivie

50

described Sterling as "squared up" to Eastman in a threatening manner, but both Williams and Ivie denied that Ivie said it was "close to workplace violence."

Moreover, Sterling did not present any evidence to suggest that Ivie harbored discriminatory or retaliatory animus. Ivie was on the interview panel that recommended Sterling be hired. Ivie testified that he wanted Sterling to come work for him as a commercial electrical field inspector. Ivie was initially opposed to Sterling's release. Sterling's theory at trial was that Ivie was an opportunist, helping Washko and Stowe terminate Sterling so that he could be promoted. In this context, the mere fact that Ivie failed to intervene or report the Eastman incident to HR is not substantial evidence that Ivie subjectively entertained serious doubts as to the truth of his description of the event to Williams.[17] There is no substantial evidence that Ivie's statements were made with malice. Thus, the County was entitled to JNOV on the defamation claim.

### III

### *Award of Attorney Fees*

The County also challenges the trial court's order awarding Sterling $1,113,750 in attorney fees. The County contends the fee award was improperly calculated and that the amount of the award is excessive.

A.    *Additional background*

"[A] prevailing plaintiff in a [FEHA] lawsuit is usually entitled by statute to receive an award of attorney fees." (*Caldera v. Department of Corrections & Rehabilitation* (2020) 48 Cal.App.5th 601, 606.) Through the attorney fee award, the

---

**17**    Sterling also relies on Ivie's admission that there was a desk or counter physically separating Sterling from Eastman, suggesting that the incident could not have happened the way Ivie described it to Williams. This assumes that Ivie was accusing Sterling of something close to workplace violence. As described above, this is not what Ivie said. Thus, we fail to see how the presence of a desk or counter proves that Ivie acted with malice. (*Lundquist v. Reusser, supra*, 7 Cal.4th at p. 1204 [malice is not inferred from the communication itself].)

FEHA encourages attorneys to vindicate the rights of employees to work in environments free from unlawful retaliation and discrimination. (*Id*. at p. 607.)

In determining the amount of an attorney fee award under the FEHA, courts generally use the well-established lodestar method. (*Caldera v. Department of Corrections & Rehabilitation, supra*, 48 Cal.App.5th at p. 607.) The trial court begins by calculating the lodestar figure based on the number of hours reasonably expended by counsel in the presentation of the case, multiplied by the prevailing hourly rate for private attorneys in the community conducting similar work. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1131-1133 (*Ketchum*).) The lodestar figure represents the "basic fee for comparable legal services in the community." (*Id*. at p. 1132.)

Once the trial court has determined the lodestar figure, it may then increase or decrease that amount by applying a positive or negative "multiplier" to take other factors into account. (*Ketchum, supra*, 24 Cal.4th at p. 1132.) Such factors may include, but are not limited to: (1) the novelty and difficulty of the questions involved; (2) the skill displayed in presenting them; (3) the extent to which the nature of the litigation precluded other employment; and (4) the contingent nature of the fee award. (*Ibid*.) The purpose of the adjustment is to "fix a fee at the fair market value for the particular action." (*Ibid*.) However, to avoid "improper double counting," our Supreme Court has cautioned that "a trial court should not consider these factors to the extent they are already encompassed within the lodestar." (*Ketchum*, at p. 1138.)

The determination of what constitutes reasonable attorney fees is committed to the trial court's sound discretion. (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095-1096.) An appellate court will interfere with a determination of reasonable attorney fees only if there has been a manifest abuse of discretion. (*Id*. at p. 1095.)

After prevailing at trial, Sterling filed a motion seeking $1,515,270 in attorney fees based on a lodestar figure of $757,635, enhanced by a 2.0 multiplier. In support of the lodestar, Sterling submitted declarations and exhibits (timesheets) showing that

attorney Jill Telfer (Telfer) billed 1,152.9 hours at rates ranging from $550 to $575 per hour, and that attorney Patrick Crowl (Crowl) billed 481.8 hours at the rate of $225 per hour. Sterling also attached declarations from other attorneys attesting that the rates claimed by Telfer and Crowl were reasonable for attorneys of similar skill and experience litigating similar cases in the community. In opposition, the County argued that the total fee award should be no larger than $580,635.

The trial court calculated a lodestar figure of $742,500 by finding every hour claimed by Sterling's counsel to be reasonable, and applying a rate of $550 per hour for Telfer and $225 per hour for Crowl. The court applied a multiplier of 1.5 to the lodestar figure because of the difficulty of Sterling's claims, the "expert level of skill" displayed by counsel, the extent to which the litigation restricted counsel's capacity to accept or perform other work, and the contingency risk. The total fee award was $1,113,750.

B.    *Analysis*

The County argues that the trial court abused its discretion in awarding fees to Sterling because the trial court breached its duty to review the hours claimed to avoid inefficient or duplicative efforts. As support for this argument, the County notes that the trial court failed to strike a single hour, despite "obvious" examples of padding in the time records.

Although we acknowledge that the number of hours claimed is high, we are not persuaded that the court's decision to approve all the hours claimed demonstrates that it abdicated its duty. The court stated in its ruling that it "carefully considered the points and arguments made in the supporting and opposition papers, as well as by counsel at the hearing." It is the trial court's role to examine the evidence and we must presume, in the absence of evidence to the contrary, that it performed its duty. (*Christian Research Institute v. Alnor* (2008) 165 Cal.App.4th 1315, 1324.) The examples cited by the County are not so obviously "padded" that it proves the court necessarily abused its discretion. (*Sundance v. Municipal Court* (1987) 192 Cal.App.3d 268, 274 [time spent

53

on an unsuccessful theory still may be reasonably incurred].)  Likewise, while the trial court had the discretion to penalize counsel for block billing (*In re Marriage of Nassimi* (2016) 3 Cal.App.5th 667, 695-696), the County has not cited any authority to show the trial court was required to do so.

The County next contends that there is no evidence to support the hourly rates awarded to Telfer.  The County contends that the rates charged by Telfer—$550 an hour—were unreasonable because they included compensation for contingency risk.  The County makes a related contention that the trial court erroneously considered the same factors, both for purposes of determining a reasonable hourly rate and for the multiplier.  Both contentions fail for lack of support.

In essence, the County asserts that the $550 hourly rate "can only be explained as having already factored in compensation for contingent risk, delay in payment, skill, and the like."  But the County cites no evidence to support its contention that the $550 hourly rate necessarily encompasses a contingency risk, delay, or "expert level of skill."  There is nothing in the court's order to suggest such factors were intended to be encompassed within the $550 hourly rate.  In contrast, there is evidence to suggest they are not.  Christopher Whalen stated in his declaration that he was awarded an hourly rate of $625, with a multiplier of 1.5, in a Sacramento County employment case in 2011.  Moreover, based on his knowledge and experience in the community, he stated that an hourly rate of $650 to $695 would be an appropriate hourly rate for Telfer before application of any multiplier.  Thus, the County has failed to show that the $550 hourly rate is unreasonable or that the court's fee enhancement is the result of improper double counting.

## DISPOSITION

The order denying the motion for JNOV is reversed as to the fourth cause of action, for defamation, with directions to the trial court to enter JNOV in favor of defendant on that count.  In all other respects, the judgment and the order awarding

54

attorney fees are affirmed.  The parties shall bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(5).)

      KRAUSE     , J.

We concur:

      RAYE     , P. J.

      DUARTE     , J.